PROTECTED INFORMATION REDACTED

**IN UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **AHMED ADNAN AJAM (ISN 326),** | ) | |
| | ) | |
| *Petitioner* | ) | |
| | ) | |
| v. | ) | **Civil Action No. 09-745 (RCL)** |
| | ) | |
| **BARACK OBAMA,** *et al.,* | ) | |
| | ) | |
| *Respondents.* | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S MOTION FOR
PARTIAL SUMMARY JUDGMENT ON THE FIRST CLAIM OF PETITIONER'S
<u>AMENDED PETITION FOR WRIT OF HABEAS CORPUS</u>**

PROTECTED INFORMATION REDACTED

PROTECTED INFORMATION REDACTED

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. iii

I. INTRODUCTION ...................................................................................... 1

II. STATEMENT OF UNDISPUTED MATERIAL FACTS ......................................... 1

   A. Ajam's Original Detention and Summary of Habeas History ............................ 2

   B. Undisputed Facts Related to Negotiations for Transfer ................................... 3

   C. Enactment of NDAA Certification Requirements ........................................... 5

   D. Presidential Statements Related to Section 1028's Unconstitutional Interference
      with Exercise of Executive Authority ....................................................... 7

   E. Impact of Certification Requirements ....................................................... 8

III. ARGUMENT .......................................................................................... 9

   A. Standard of Decision ......................................................................... 9

   B. Declaratory Judgment is the Proper Method to Address the Constitutionality of a
      Statute. ...................................................................................... 9

   C. The Court Should Grant Petitioner's Request for Declaratory Relief Because
      Congress' Intrusion into the President's Decision to Cease Targeting Him is
      Unconstitutional. ........................................................................... 10

      1. The President's Exclusive Power Under the Commander-in-Chief Clause
         Precludes Congress' Power to Interfere with Targeting Decisions Within
         the Scope of Authorized Armed Conflict. ............................................ 11

      2. The President's Power Under the Foreign Affairs Clause Precludes
         Congress' Interference with Executive Agreements and Sensitive
         Diplomatic Negotiations. .............................................................. 15

   D. Section 1028 is an Unconstitutional Bill of Attainder. ................................... 19

   E. Petitioner Has Standing to Request Declaratory Relief. .................................. 21

      1. Standing Generally. ..................................................................... 21

      2. Petitioner Has Standing to Challenge a Violation of the Separation of
         Powers. .................................................................................. 22

      3. Petitioner Meets the Constitutional Test for Standing Because He Suffers a
         Concrete Injury, Fairly Traceable to the Statutory Barriers in Section 1028
         of the NDAA, and Voiding the Statute Will Redress the Injury. ................... 24

         a. Petitioner suffers a concrete, actual injury. ................................. 24

            i. Impairment of the opportunity for release of any prisoner
               cleared for release is a present injury............................... 25

            ii. The 2011 NDAA and its successors have directly impaired
               Ajam's actual release. ................................................ 27

         b. Petitioner's injuries are directly traceable to the certification
            requirements under the NDAA. .............................................. 27

            i. Barriers to release are self-evidently caused by the
               statute. ................................................................. 28

PROTECTED INFORMATION REDACTED

PROTECTED INFORMATION REDACTED

    ii.  The record shows that the certification requirements
        scuttled Petitioner's imminent release. ........................... 28

c.  Striking Down Section 1028 Will Redress Petitioner's
   Injuries. ................................................................................. 30

    i.  The injury caused by the statutory barriers erected by
      Section 1028 of the NDAA will be redressed by voiding
      it. .................................................................................. 30

    ii.  The record in this case amply demonstrates that striking
       down Section 1028 of the NDAA will redress Petitioner's
       continued detention. ....................................................... 30

CONCLUSION ........................................................................................ 31

PROTECTED INFORMATION REDACTED

PROTECTED INFORMATION REDACTED

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*Adarand Constructors, Inc. v. Pena,*
  515 U.S. 200 (1995) ............................................................................ 26

*Allen v. Wright,*
  468 U.S. 737 (1984) .......................................................... 22

*Am. Ins. Ass'n v. Garamendi,*
  539 U.S. 396 (2003)........................................................................ 16

*\*Arlington Heights v. Metro. Hous. Dev. Corp.,*
  429 U.S. 252 (1977) ................................................................ 30, 31

*Baker v. Carr,*
  369 U.S. 186 (1962) .......................................................... 22, 26

*Bond v. United States,*
  131 S. Ct. 2355 (2011) .................................................... 23, 24

*\*Boumediene v. Bush,*
  553 U.S. 723 (2008) ....................................................................*passim*

*Burke v. Gould,*
  286 F.3d 513 (D.C. Cir. 2002)............................................................9

*Carey v. Klutznick,*
  637 F.2d 834 (2d Cir. 1980) ....................................................... 26

*Clapper v. Amnesty Int'l,*
  133 S. Ct. 1138 (2012) ................................................... 22

*Consumer Mail Order Ass'n of Am. v. McGrath,*
  94 F. Supp. 705 (D.D.C 1950)............................................................9

*\*Dep't of the Navy v. Egan,*
  484 U.S. 518 (1988) ................................................................ 15

*\*Duke Power Co. v. Carolina Envtl. Study Grp., Inc.,*
  438 U.S. 59 (1978) ................................................................ 29, 30

*Earth Island Inst. v. Christopher,*
  6 F.3d 648 (9th Cir. 1993) ................................................. 15

*\*Ex parte Milligan,*
  71 U.S. (4 Wall.) 2, 139 (1866) .................................................. 12

*Ex parte Quirin,*
  317 U.S. 1 (1942) .........................................................................11

*Focus on the Family v. Pinellas Suncoast Transit Auth.,*
  344 F.3d 1263 (11th Cir. 2003) ............................................... 27

*Fleming v. Page,*
  50 U.S. (9 How.) 603 (1850) ....................................................... 12

iii

PROTECTED INFORMATION – FILED UNDER SEAL

* *denotes chief authority pursuant to L.Cv.R. 7(a)*

PROTECTED INFORMATION REDACTED

*Hamdi v. Rumsfeld,*
    542 U.S. 507 (2004) ............................................................................... 11, 27

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982) ....................................................................................... 15

*Hunt v. Cromartie,*
    526 U.S. 541 (1999) ......................................................................................... 9

*INS v. Chadha,*
    462 U.S. 919 (1983) ................................................................................. 22, 23

*Johnson v. Eisentrager,*
    339 U.S. 763 (1950) ....................................................................................... 15

*Kiyemba v. Obama,*
    561 F.3d 509 (D.C. Cir. 2009) ........................................................ 18, 25, 27

*Kiyemba v. Obama,*
    605 F.3d 1046 (D.C. Cir. 2010) ............................................................. 20, 21

*Kiyemba v. Obama,*
    131 S. Ct. 1631 (2011) ................................................................................... 21

*Ludecke v. Watkins,*
    335 U.S. 160 (1948) ....................................................................................... 16

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ......................................................................... 23, 24, 27

*McMullen v. United States,*
    953 F.2d 761 (2d Cir. 1992) .......................................................................... 19

*MedImmune, Inc. v. Genentech, Inc.,*
    549 U.S. 118 (2007) ....................................................................................... 10

*Nixon v. Admin. of Gen. Servs.,*
    433 U.S. 425 (1977) ....................................................................................... 20

*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982) ....................................................................................... 15

*Ne. Fla. Chapter, Associated Gen. Contractors of Am. v. Jacksonville,*
    508 U.S. 656 (1993) ....................................................................................... 26

*Prieto-Herrera v. Ashcroft,*
    No. 02-v-7397, 2003 WL 22019353 (N.D. Ill. Aug. 26, 2003) ...................... 10

*Regents of Univ. of California v. Bakke,*
    438 U.S. 265 (1978) ....................................................................................... 26

*Settles v. U.S. Parole Comm'n,*
    429 F.3d 1098 (D.C. Cir. 2005) .................................................................... 25

*Steffel v. Thompson,*
    415 U.S. 452 (1974) ......................................................................................... 9

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ....................................................................................... 22

PROTECTED INFORMATION – FILED UNDER SEAL
* denotes chief authority pursuant to L.Cv.R. 7(a)

PROTECTED INFORMATION REDACTED

*Tozzi v. U.S. Dep't of Health & Human Servs.,
   271 F.3d 301 (D.C. Cir. 2001) ..................................................................... 27, 30

United States v. Belmont,
   301 U.S. 324 (1937) ....................................................................................... 16

*United States v. Curtiss-Wright Export Corp.,
   299 U.S. 304 (1936) ................................................................................... 15, 18

United States v. Lopez,
   650 F.3d 952 (3d Cir. 2011) ........................................................................... 25

United States v. Lovett,
   328 U.S. 303 (1946) ....................................................................................... 19

United States v. Students Challenging Regulatory Agency Procedures (SCRAP),
   412 U.S. 669 (1973) ....................................................................................... 25

Warth v. Seldin,
   422 U.S. 490 (1975) ....................................................................................... 22

Wilkinson v. Dotson,
   544 U.S. 74 (2005) ......................................................................................... 10

*Zivotofsky ex rel. Zivotofsky v. Sec'y of State,
   No. 07-5347, slip op. (D.C. Cir. July 23, 2013) ....................................... passim

*Zivotofsky ex rel. Zivotofsky v. Sec'y of State,
   444 F.3d 614 (D.C. Cir. 2006) ....................................................................... 23

Zivotofsky ex rel. Zivotofsky v. Clinton,
   132 S. Ct. 1421 (2012) ................................................................................... 23


**Constitutional Provisions**

U.S. Const. art I, § 8 ........................................................................................... 11
*U.S. Const. art II, § 2 ........................................................................................ 11


**Statutes**

28 U.S.C. § 2201(a) ......................................................................................... 1, 9
28 U.S.C. § 2202 ............................................................................................. 1, 9
28 U.S.C. § 2241 ................................................................................................. 1
28 U.S.C. § 2242 ................................................................................................. 1

Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (Sept. 18, 2001) ... 12
National Defense Authorization Act for Fiscal Year 2011, Pub. L. No. 111-383, 124 Stat. 4137
(Jan. 7, 2011) ...................................................................................................... 2

PROTECTED INFORMATION – FILED UNDER SEAL
* denotes chief authority pursuant to L.Cv.R. 7(a)

PROTECTED INFORMATION REDACTED

National Defense Authorization Act for Fiscal Year 2012, Pub. L. No. 112-81, § 1028(d), 125 Stat. 1298 (Dec. 31, 2011) ......................................................................................................... 7

National Defense Authorization Act for Fiscal Year 2013, Pub. L. No. 112-239, § 1028, 126 Stat. 1632 (Jan. 2, 2013) ................................................................................................. *passim*

Supplemental Appropriations Act for Fiscal Year 2009, Pub. L. No. 111-32, § 14103(d), 123 Stat. 1859 (Jun. 24, 2009) ....................................................................................................... 2, 5

## **Rules**

Fed. R. Civ. P. 56(a) ................................................................................................................. 1

Fed. R. Civ. P. 57 ................................................................................................................... 1, 9

L.Cv.R. 7(a) ............................................................................................................................. 1

L.Cv.R. 7(h)(1) ........................................................................................................................ 1

## **Other Authorities**

David J. Barron & Martin S. Lederman, *The Commander In Chief at the Lowest Ebb—Framing the Problem, Doctrine, and Original Understanding*, 121 Harv. L. Rev. 689 (2008)................12

Guantánamo Review Task Force, Final Report (2010), available at http://www.justice.gov/ag/guantanamo-review-final-report.pdf. ............................................. 3, 4

Press Briefing by White House Press Secretary Jay Carney (May 1, 2013), http://www.whitehouse.gov/the-press-office/2013/05/01/press-briefing-press-secretary-jay-carney-512013 ................................................................................................................... 13, 21, 28

Statement by the Press Secretary on Guantanamo Bay (July 26, 2013), http://www.whitehouse.gov/the-press-office/2013/07/26/statement-press-secretary-guantanamo-bay .......................................................................................................................... *passim*

Statement on Signing the National Defense Authorization Act for Fiscal Year 2012 (Dec. 31, 2011), http://www.whitehouse.gov/the-press-office/2011/12/31/statement-president-hr-1540 ........................................................................................................................... 8, 21

Statement on Signing the National Defense Authorization Act for Fiscal Year 2013 (Jan. 3, 2013), http://www.whitehouse.gov/the-press-office/2013/01/03/statement-president-hr-4310 ......................................................................................................................... *passim*

*The Guantánamo Docket*, N.Y. Times, http://projects.nytimes.com/guantanamo/timeline ............................................................... 8, 29

PROTECTED INFORMATION – FILED UNDER SEAL
* *denotes chief authority pursuant to L.Cv.R. 7(a)*

PROTECTED INFORMATION REDACTED

## I.   INTRODUCTION

More than three years ago, the Commander-in-Chief determined that he wished to cease targeting Petitioner Ahmed Adnan Ajam with military force. But military force continues to be asserted against Petitioner to this day because of the unconstitutional intrusion of Congress into targeting decisions reserved to the President.

Pursuant to Fed. R. Civ. P. 56(a) and 57, L.Cv.R. 7(a) and 7(h)(1), 28 U.S.C. §§ 2201(a); 2202; 2241(a), (c)(l) and (c)(3); and 2242, Petitioner has moved for partial summary judgment as to the first claim for relief in his Amended Petition for Writ of Habeas Corpus. He seeks a declaration that Section 1028 of the National Defense Authorization Act for Fiscal Year 2013, Pub. L. No. 112-239, 126 Stat. 1632 (Jan. 2, 2013) ("2013 NDAA") is unconstitutional as applied to him. He submits this Memorandum of Law to set out the grounds for the motion.

## II.   STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to L.Cv.R 7(h)(1), Petitioner has submitted a Statement of Undisputed Material Facts ("Statement"). He summarizes those facts here.

Petitioner, a Syrian national, has been detained for well over a decade at the Guantanamo Detention Facility. Statement at ¶¶ 1, 4. The government has never charged him with criminal wrongdoing. The only justification ever asserted was the President's claim that Ajam was targetable with military force, in the form of detention, as an enemy belligerent. Statement at ¶ 5. Ajam has always disputed that claim. *Id.*

While Ajam denies that he was ever an enemy belligerent, the dispute became an academic exercise when the President, exercising the same Constitutional authority by which Ajam originally was targeted, determined to desist from targeting Ajam, and pursuant to his powers as Commander-in-Chief and his powers over foreign affairs, to transfer Ajam to another country. *Id.* at ¶ 7 (citing Marshall Decl. at ¶ 3). In 2010, the ████████████████

1

PROTECTED INFORMATION REDACTED

██████████████. *Id.* at ¶ 9 (citing Marshall Decl. at ¶ 5). ███████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████, however, Congress

enacted the National Defense Authorization Act for Fiscal Year 2011, Pub. L. No. 111-383, 124

Stat. 4137 (Jan. 7, 2011) ("2011 NDAA"), imposing restrictions upon ████████.[1]  In each of

2012 and 2013, Congress has continued to enact legislation (attached to Department of Defense

funding bills) intruding on the Commander-in-Chief's sole discretion to desist from targeting

Ajam, with the direct——and intended—result of forcing the President to continue targeting

Ajam.  These provisions bar transfer or release of Ajam and a precisely defined group of

prisoners held at Guantánamo Bay, except upon delivery by an executive branch officer to

Congress of certain certifications. *See* 2011 NDAA; 2013 NDAA, and discussion, *infra*.

### A.    Ajam's Original Detention and Summary of Habeas History

Ajam was detained in 2002, and has been imprisoned, without criminal charge, for more

than a decade.  Statement at ¶ 4.  He was one of many prisoners upon whose behalf, in 2005, a

joint petition for a writ of habeas corpus was filed in the action styled *Mohammon v. Bush*, No.

05-2386 (D.D.C. 2005) (RBW).  In 2008, the case was transferred to Judge Hogan for

coordination.  Ajam's case was reassigned several times, and in April, 2009, assigned to this

Court. *See* Order of April 21, 2009, *Al Sanani v. Obama*, No. 05-cv-2386, (D.D.C. Apr. 21,

2009) (RBW).  The matter is now docketed as *Ajam v. Obama*, No. 09-cv-745 (D.D.C. 2009)

(RCL) and captioned as reflected above.  Petitioner's habeas petition was previously the 2005

*Mohammon* petition, a lengthy, omnibus petition seeking relief on behalf of a number of

prisoners with differing circumstances.  In 2010, ████████████████████████

████████████████████████████████████████████████████.

---

[1] Requirements for reporting to Congress prior to transferring detainees were first enacted in 2009.  Supplemental Appropriations Act for Fiscal Year 2009, Pub. L. No. 111-32, § 14103(d), 123 Stat. 1859 (June 24, 2009).

███████████████████████████████████████████████████

████████████   Since then, however, Ajam's transfer has failed to come to pass.

On June 21, 2013, Ajam moved this Court ███████████████   and for leave to amend the petition for habeas corpus to challenge the validity of the NDAA.  Docket No. 1717. The Court granted Ajam's motion on July 19, 2013.  Docket No. 1738.  The Amended Petition for Writ of Habeas Corpus now serves as the operative petition.  This motion for partial summary judgment follows.

**B.      Undisputed Facts Related to Negotiations for Transfer**

Immediately upon his first inauguration, President Obama created the Guantánamo Review Task Force and charged it with determining what should be done with each of the prisoners still detained at Guantánamo.  Unlike previous considerations of the cases of those detained at Guantánamo, the Task Force's examination was both comprehensive and rigorous:

> **Comprehensive Interagency Review.**  The Task Force consisted of more than 60 career professionals, including intelligence analysts, law enforcement agents, and attorneys, drawn from the Department of Justice, Department of Defense, Department of State, Department of Homeland Security, Central Intelligence Agency, Federal Bureau of Investigation, and other agencies within the intelligence community.

> **Rigorous Examination of Information.**  The Task Force assembled large volumes of information from across the government relevant to determining the proper disposition of each detainee.  Task Force members examined this information critically, giving careful consideration to the threat posed by the detainee, the reliability of the underlying information, and the interests of national security.

Guantánamo Review Task Force, Final Report, at page i (2010), available at

http://www.justice.gov/ag/guantanamo-review-final-report.pdf.

3

PROTECTED INFORMATION REDACTED

The account of communications among Ajam, his undersigned counsel, and the Departments of State and Justice contained within the following paragraphs of this section was set forth in the Declaration of David S. Marshall ("Marshall Decl."), which accompanied Petitioner's Motion ████████████████████ and Motion for Leave to Amend Habeas Corpus Petition. Docket No. 1717.

In November 2009, Marshall learned the Guantánamo Review Task Force had cleared Ajam for transfer. Statement at ¶ 7 (Marshall Decl. at ¶ 3). This decision, like all the Task Force's transfer decisions, "was reached by the unanimous agreement of the agencies responsible for the review: the Department of Justice, Department of Defense, Department of State, Department of Homeland Security, Office of the Director of National Intelligence, and Joint Chiefs of Staff." Guantánamo Review Task Force, *supra*, at i. The Task Force's guidelines allowed it to limit a particular detainee's transfer "to specified countries or under specified conditions." *Id.* at 7. So far as Ajam or Marshall knows, the task force saw no need to limit Ajam's transfer either to particular countries or under particular conditions. Statement at ¶ 8 (Marshall Decl. at ¶ 3).

████████████████████████████████
████████████████████████████████
████████████████████████████████
███████████████████

A few weeks after the task force approved Ajam for transfer, a Department of Justice attorney informed Marshall that ████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████

PROTECTED INFORMATION REDACTED

████████████████████████████████████████████████████████

████████████████████████████ Marshall relayed this to the State Department later in

September. *Id.*

In a January 2011 conference call, State Department officials told Marshall that ██████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

### C.    Enactment of NDAA Certification Requirements

In 2009 the President began desisting from the targeting of specific Uighurs who had been held for many years at Guantánamo Bay even though the government had long recognized they had never been enemies of the United States or its allies.  Congress responded by beginning its interference with Executive decisions to cease targeting Guantanamo prisoners.[2]  Its interference reached a new level of intrusion on January 7, 2011, with enactment of the 2011 NDAA.  Most recently, on January 2, 2013, Congress enacted the 2013 NDAA, which is effective today.  Like its predecessors in 2011 and 2012, Section 1028 of the 2013 NDAA bans any transfer of a Guantánamo detainee unless the Secretary of Defense, "with the concurrence of the Secretary of State and in consultation with the Director of National Intelligence," shall have made certain certifications to Congress.

---

[2] The Supplemental Appropriations Act of 2009, Pub. L. No. 111-32, 123 Stat. 1859 (June 24, 2009) followed soon after it became public that the President planned to release certain Uighurs who had never been enemy belligerents.  The legislation purported to bar the use of funds to effectuate the transfer of a Guantánamo detainee to a foreign country unless, 15 days prior to such transfer, the President submitted a classified report to Congress concerning the identity of the detainee, the risk the transfer poses to U.S. security, and the terms of any agreement with the receiving country concerning the acceptance of the individual, including any financial assistance related to the agreement.

5

PROTECTED INFORMATION REDACTED

*Certification Requirements.* Before the Commander-in-Chief may desist from targeting a particular detainee by effecting his transfer or release, the Secretary of Defense must certify to Congress under Section 1028(b)(1) that the transferee state:

> (A) is "not a designated state sponsor of terrorism or a designated terrorist organization;"
>
> (B) controls "each detention facility in which the individual is to be detained;"
>
> (C) does not "as of the date of certification, fac[e] a threat that is likely to substantially affect its ability to exercise control over the individual;"
>
> (D) "has taken or agreed to take effective actions to ensure that the individual cannot take action to threaten the United States, its citizens, or its allies in the future;"
>
> (E) "has taken or agreed to take such actions as the Secretary of Defense determines are necessary to ensure that the individual cannot engage or reengage in any terrorist activity"; and
>
> (F) has "agreed to share with the United States any information" related to the individual or his associates, as well as information that "could affect the security of the United States, its citizens, or its allies."

2013 NDAA § 1028(b)(1). Section 1028(c) prohibits detainee transfers to states with past experience with recidivism, except in compliance with an order from a court of competent jurisdiction.[3] In addition, Section 1028 contains extensive reporting requirements obliging the President to report to Congress concerning releases and transferee states. *See* 2013 NDAA § 1028(d)(2).

---

[3] A judicial order is also an exception to the Section 1028(b)(1) requirements. *See* NDAA § 1028(a)(2).

PROTECTED INFORMATION REDACTED

PROTECTED INFORMATION REDACTED

*Alternative certification requirements.* Section 1028(d) contains alternative certification requirements (sometimes described as "waiver" provisions). [4]   As an alternative to the requirements of Sections 1028(b)(1)(D), (b)(1)(E), and (c)(1), subsection 1028(d) permits the Secretary of Defense to certify to Congress that he has ensured against risk, as those sections require, in a different way: that alternative actions will be taken to effectuate the same purpose, § 1028(d)(1)(A); that the alternative actions will substantially mitigate risks, §§ 1028(d)(1)(B) and (C); and that transfer is in the national security interests of the United States. § 1028(d)(1)(D). Similar certifications may be made as an alternative to the prohibition against transferring detainees to countries with any history of recidivism.  § 1028(d)(1)(B) and (C).  No alternative certification is permitted for the requirements in Sections 1028(b)(1)(A), (B), (C) or (F).

### D.    Presidential Statements Related to Section 1028's Unconstitutional Interference with Exercise of Executive Authority

In signing the 2013 NDAA, the President described Section 1028's restrictions as fundamentally unwarranted, observing that "[t]his provision hinders the Executive's ability to carry out its military, national security, and foreign relations activities and would, under certain circumstances, violate separation of powers principles."  Statement on Signing the National Defense Authorization Act for Fiscal Year 2013 (Jan. 3, 2013), http://www.whitehouse.gov/the-press-office/2013/01/03/statement-president-hr-4310 ("2013 Signing Statement").  The President had earlier expressed the same view as to the 2012 version of the law:

> Section 1028 modifies but fundamentally maintains unwarranted restrictions on the executive branch's authority to transfer detainees to a foreign country.  This hinders the executive's ability to carry out its military, national security, and foreign relations activities and ... would, under certain circumstances, violate constitutional separation of powers principles.  The executive branch must have the flexibility to act swiftly in conducting negotiations with foreign countries regarding the circumstances of detainee transfers.  In the event that the statutory restrictions in

---

[4] The alternative provisions were added for 2012, *see* National Defense Authorization Act for Fiscal Year 2012, Pub. L. No. 112-81, § 1028(d), 125 Stat. 1298 (Dec. 31, 2011), and are included in the 2013 NDAA, *see* § 1028(d).

PROTECTED INFORMATION REDACTED

PROTECTED INFORMATION REDACTED

> section[ ] … 1028 operate in a manner that violates constitutional
> separation of powers principles, my Administration will interpret
> them to avoid the constitutional conflict.

Statement on Signing the National Defense Authorization Act for Fiscal Year 2012 (Dec. 31,

2011), http://www.whitehouse.gov/the-press-office/2011/12/31/statement-president-hr-1540

("2012 Signing Statement").

### E.    Impact of Certification Requirements

The impact of the certification requirements has been dramatic.  Prior to 2009, President

Bush determined to cease targeting at least 459 men detained at Guantanamo Bay.  *The

Guantánamo Docket*, N.Y. Times,  http://projects.nytimes.com/guantanamo/timeline  ("*The

Guantánamo Docket*").  They were released and repatriated or settled in third countries without

interference from Congress.  *Id.*  In 2009 and 2010, despite Congressional interference, releases

continued steadily based on the Executive's declared policy of closing the prison.  Between

January 7, 2011, when the present certifications were first enacted, and July 26, 2013, not a

single prisoner was transferred, except those prisoners convicted of war crimes who had served

their sentences, or Uighur prisoners transferred following grants by the court of habeas relief.  *Id.*

Even then, the President again expressed frustration that the certification requirements

"significantly limit[ed] [his] ability to transfer detainees out of Guantanamo, even those who

have been approved for transfer."  Statement by the Press Secretary on Guantanamo Bay (July 26,

2013),     http://www.whitehouse.gov/the-press-office/2013/07/26/statement-press-secretary-

guantanamo-bay ("July 26, 2013 White House Statement").   In 2011, more men died at

Guantanamo than were released.  *The Guantánamo Docket*.  ███████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

PROTECTED INFORMATION REDACTED

PROTECTED INFORMATION REDACTED

In addition to the sweeping impact described above, the 2011 NDAA instantly stopped Ajam's release process.  Statement at ¶ 12 (Marshall Decl. at ¶ 6).  Ajam remains in prison today.

## III.   ARGUMENT

### A.   Standard of Decision.

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed R. Civ. P. 56(c); *see also, e.g., Hunt v. Cromartie*, 526 U.S. 541, 549 (1999); *Burke v. Gould*, 286 F.3d 513, 519-20 (D.C. Cir. 2002).  There are no genuine issues of material fact as to the circumstances of Petitioner's detention, the Executive's determination to cease targeting him, its mature plans to effect his release, the timing and content of the certification requirements inserted by Congress, and the sudden halt of the process.  Petitioner shows below that, on the basis of these undisputed facts, he is entitled to judgment as a matter of law that Section 1028 violates the separation of powers, and, in the alternative, is an unlawful bill of attainder.

### B.   Declaratory Judgment is the Proper Method to Address the Constitutionality of a Statute.

Declaratory judgment is the appropriate vehicle for challenging the constitutionality of a statute.  *See* Fed. R. Civ. P. 57; 28 U.S.C. §§ 2201-02; *Steffel v. Thompson*, 415 U.S. 452, 466-68 (1974) (explaining that the purpose of the Declaratory Judgment Act was to allow challengers to test the constitutionality of statutes); *Consumer Mail Order Ass'n of Am. v. McGrath*, 94 F. Supp. 705, 709 (D.D.C 1950) ("[W]e think it is within our discretion under the Declaratory Judgment Act to decide the constitutional question ... .").  Because Petitioner challenges the constitutionality of Section 1028 of the NDAA, his request for declaratory relief fits squarely within the purpose of the Declaratory Judgment Act.

PROTECTED INFORMATION REDACTED

PROTECTED INFORMATION REDACTED

The general utility of the act applies with particular force in *habeas corpus*. A petitioner may seek declaratory relief in a habeas corpus proceeding when his detention is unlawfully extended through an unconstitutional statute. *See, e.g.*, *Wilkinson v. Dotson*, 544 U.S. 74, 81 (2005) (in state habeas context, petition may seek to "invalidate the duration of [ ] confinement —either *directly* through an injunction compelling speedier release or *indirectly* through a judicial determination that necessarily implies the unlawfulness of the State's custody"); *Prieto-Herrera v. Ashcroft*, No. 02-v-7397, 2003 WL 22019353, at *2 (N.D. Ill. Aug. 26, 2003) (in immigration context, habeas proceedings are an "appropriate forum for statutory and constitutional challenges").[5] The facts and circumstances of Ajam's detention, the enactment of the 2011 NDAA and subsequent law, and the President's determination to cease targeting being undisputed, declaratory judgment is appropriate.

**C.      The Court Should Grant Petitioner's Request for Declaratory Relief Because Congress' Intrusion into the President's Decision to Cease Targeting Him is Unconstitutional.**

Using his powers as Commander-in-Chief, the President directed military force at Petitioner by detaining him at the Naval Station in Guantánamo Bay, Cuba. After the President later decided to desist from the use of that force against Petitioner, Congress unconstitutionally interfered with his exercise of the power to desist from that force. Its interference has hampered the exercise of the President's authority as Commander-in-Chief and intruded upon his control of foreign affairs. By placing requirements and limitations upon the President's discretion to desist in the exercise of military force, and by addressing the nature and conduct of transferee nations and imposing requirements for other countries' cooperation with the United States, Section 1028 interferes with the President's targeting authority as Commander-in-Chief, under Article II, Section 2 of the Constitution, and his authority over sensitive diplomatic negotiations with other

---

[5] To obtain a declaratory judgment, a petitioner need only demonstrate an independent basis of federal jurisdiction and an actual case or controversy. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007).

10

PROTECTED INFORMATION REDACTED

PROTECTED INFORMATION REDACTED

countries.   *See* 2013 Signing Statement.   In the alternative, Section 1028 amounts to an unconstitutional bill of attainder against Petitioner.

Petitioner has standing to raise an objection to Section 1028 of the NDAA because the law diminishes his opportunity to be released and has contributed directly to his continued detention.   Although he is not a member of the executive branch, Petitioner has standing to challenge a violation of the separation of powers where, as here, he has suffered a concrete and personal harm in consequence of an intrusion upon the competence of the executive.

> 1. **The President's Exclusive Power Under the Commander-in-Chief Clause Precludes Congress' Power to Interfere with Targeting Decisions Within the Scope of Authorized Armed Conflict.**

Article I, Section 8 of the Constitution gives Congress the exclusive power to declare war. But under Article II, Section 2 of the Constitution, the President is granted the exclusive power to carry out that war: he "shall be Commander in Chief of the Army and Navy of the United States...."   As Commander-in-Chief, the President has the power to direct, against specific lawful targets, the "military force" that Congress has generally authorized him to use: that is, against lawful objects of military force within the scope of the congressional authorization.

"Military force" may take various forms.   Lethal force is one.   Detention of the enemy belligerent is another.   As the Supreme Court noted in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), the detention of individuals who fought against the United States in Afghanistan "for the duration of the particular conflict in which they were captured, is so fundamental and accepted an incident to war *as to be an exercise of the 'necessary and appropriate force' Congress has authorized the President to use*," *id.* at 518 (emphasis added); *see Boumediene v. Bush*, 553 U.S. 723, 733 (2008) (reaffirming that detention is a form of force the President is authorized to use as part of his war powers); *see also Ex parte Quirin,* 317 U.S. 1, 28, 30 (1942).   Because Ajam has never been charged with any crime, his detention at Guantánamo can only be an exercise by the President of claimed power to use *military force*, under the putative authority of the

11

PROTECTED INFORMATION REDACTED

PROTECTED INFORMATION REDACTED

Authorization for Use of Military Force ("AUMF"), Pub. L. No. 107-40, 115 Stat. 224 (Sept. 18, 2001).   In other words, Ajam's detention always has been, and remains today, a discrete targeting decision of the Commander-in-Chief, justified by nothing more.

Congress may not "interfere[ ] with the command of the forces and the conduct of campaigns.   That power and duty belong to the President as commander-in-chief." *Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 139 (1866); *see Fleming v. Page*, 50 U.S. (9 How.) 603, 615 (1850) ("As commander-in-chief, [the President] is authorized to direct the movements of the naval and military forces placed by law at his command, and to employ them in the manner he may deem most effectual . . . .").   The word itself – "commander" – denotes a power that by definition must be unique to one person.   "[T]here is an inviolate, preclusive core to the [Commander-in-Chief] clause."   David J. Barron & Martin S. Lederman, *The Commander In Chief at the Lowest Ebb— Framing the Problem, Doctrine, and Original Understanding*, 121 HARV. L. REV. 689, 800 (2008).

From the proposition that only the President can direct the use of military force against a specific lawful target within the broad scope of a congressional authorization to use military force, it follows that only the President can determine whether and when to *desist* from directing military force against a specific target.[6]   For example, the tactical decision whether to desist from targeting Fallujah, by retreating from it during the Iraq War, like the decision whether to attack it

---

[6] The privilege of *habeas corpus*, recognized in *Boumediene v. Bush,* gives the judicial branch power to determine whether a person in detention at Guantanamo is indeed a lawful object of such force: that is, whether he is targetable.   553 U.S. 723, 771 (2008).   But assuming, *arguendo,* that Ajam is targetable, and that active hostilities in the same armed conflict in which he was targeted continue, a decision to desist from exercising military force rests with the Commander-in-Chief alone, and is not subject to interference from the other branches.

Ajam denies that he was ever detainable – as an enemy belligerent or for any other reason—and denies the continued legality of his indefinite detention even if, *arguendo,* it could once be justified on the basis of a decade-old status determination.   That dispute should have become academic three years ago, when the Commander determined to desist from detaining him.

PROTECTED INFORMATION REDACTED

PROTECTED INFORMATION REDACTED

in the first place, must be for the President, or his delegated agents, alone. Desisting from the detention of Ajam is like retreating from Fallujah. Transfer or release of a targetable enemy belligerent represents the Commander's judgment that military force should no longer be directed against a particular target. As with other acts of desisting, that decision reflects tactical judgment uniquely for the Commander-in-Chief, and subject entirely to his risk-benefit analysis as commanding general. The tactical costs the Commander may suffer from continuing an otherwise lawful detention include the costs of maintenance (food, shelter, deployment of security forces), and the inspirational effect of continued detention on actual and potential enemy belligerents in the field.[7] As to any targetable person, it is for the Commander alone to determine whether release presents the best tactic for advancing the nation's interests in an authorized conflict. Just as it may not demand "certifications" before the President orders a retreat from Fallujah, Congress may not with certifications burden his sole discretion to desist from other targeting decisions – such as with the release of Ajam.[8]

The certification requirements in Section 1028 of the NDAA, at least to the extent they apply to transfers of detainees for release *outside* the territory of the United States, constitute a profound intrusion into the President's sole authority as Commander-in-Chief. Interference with

---

[7] The Commander-in-Chief has expressed concern that continuing to operate the Guantánamo Bay detention facility "weakens our national security by wasting resources, damaging our relationships with key allies, and strengthening our enemies." 2013 Signing Statement, *supra*; *see also* Press Briefing by White House Press Secretary Jay Carney (May 1, 2013), http://www.whitehouse.gov/the-press-office/2013/05/01/press-briefing-press-secretary-jay-carney-512013 ("May 1, 2013 White House Statement") (emphasizing President Obama's determination to close the Guantánamo Bay detention facility because it is "not efficient, effective, or in the interest of our national security. It is a recruitment tool for extremists" that "hurts our ability to cooperate with other nations and their agencies of government.").

[8] Because the relevant military force here is *detention*, in many cases it raises special legal questions because of the prisoner's privilege of *habeas corpus*. *Boumediene*, 553 U.S. at 771. The prisoner may contest that he was ever detainable at all. He may argue that the end of active hostilities has occurred. In light of *Boumediene*'s analysis, a petitioner may have substantive due process rights that would support judicial relief. None of those questions need be reached. Where the Executive has determined that it wishes to desist from using force against him, even if the Court assumes that the petitioner continues to be targetable with military force, it should still find for Ajam.

PROTECTED INFORMATION REDACTED

a tactical decision, on a target-by-target basis, constitutes direct interference with the exclusive prerogative of the Commander-in-Chief under Article II, Section 2, to make tactical decisions concerning the deployment of force during an authorized armed conflict.

The requirement that the Executive branch make a certification to Congress before desisting from a discrete exercise of military force within an authorized armed conflict by definition limits the flexibility and breadth of exercise of the Commander-in-Chief power, and is therefore unconstitutional. Here, the content of the certifications directly impairs that function. Some of the requirements address the risk presented by release of the detainee. *See* 2013 NDAA § 1028(b)(1)(B) (certification that transferee state maintains control over detention facility); *id.* § 1028(b)(1)(C) (certification that transferee state stable enough to "exercise control" over detainee); *id.* § 1028(b)(1)(D) (certification that transferee state "has taken or agreed to take effective actions to ensure that the individual cannot take action to threaten the United States, its citizens, or its allies *in the future*") (emphasis added); *id.* § 1028(b)(1)(E) (certification that transferee state has acted or agreed to act to "ensure" that the detainee will not engage in terrorist activity). Yet in making the targeting decisions that only he can make, the Commander-in-Chief may deem it prudent and necessary to exchange one risk for another. The President may release a detainee to procure an exchange of U.S. forces held by the enemy, or because he determines that the continued detention of the enemy belligerent provokes and inspires other persons to provide aid and comfort to the enemy and to endanger U.S. forces or interests, or because he determines that the financial or moral burden of detention outweighs its benefit—or for any other reason that informs his tactical judgment. Congress has no power to second-guess or burden these judgments.

Thus, as applied to a person held *only* on the President's assertion that he is an enemy belligerent, each of the certification requirements in Section 1028 of the NDAA (whether direct or alternative) related to the release or transfer of a detainee outside the territory of the United

PROTECTED INFORMATION REDACTED

States is an unconstitutional intrusion into the Commander-in-Chief's sole authority to cease directing military force against that person.  Any requirement that the President or any member of the executive branch certify *anything* to Congress as a precondition to the Commander-in-Chief's cessation of military force against a particular, targetable person infringes on the President's authority to make tactical decisions, in real time, on how best to use the force that he is authorized by the AUMF to use.

> 2.   **The President's Power Under the Foreign Affairs Clause Precludes Congress' Interference with Executive Agreements and Sensitive Diplomatic Negotiations.**

The President is the "sole organ of the federal government in the field of international relations." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936) (noting that the President's "plenary and exclusive" foreign affairs power, grounded in the Constitution, requires Congress to "accord to the President a degree of discretion and freedom from statutory restriction," especially during wartime); *see Earth Island Inst. v. Christopher*, 6 F.3d 648, 652-53 (9th Cir. 1993) (statute directing Secretary of State to initiate negotiations with foreign countries to develop treaties to protect sea turtles violated the separation of powers).

The Supreme Court has consistently "recognized 'the generally accepted view that foreign policy [is] the province and responsibility of the Executive.'" *Dep't of the Navy v. Egan*, 484 U.S. 518, 529 (1988) (quoting *Haig v. Agee*, 453 U.S. 280, 293-94 (1981)).  This foreign affairs power is exclusive: it is "the very delicate, plenary and exclusive power of the President as sole organ of the federal government in the field of international relations – a power which does not require as a basis for its exercise an act of Congress." *See Curtiss-Wright,* 299 U.S. at 320; *see also Harlow v. Fitzgerald*, 457 U.S. 800, 812 n.19 (1982) (conducting foreign affairs and protecting the national security are "'central' Presidential domains") (internal citation omitted); *Nixon v. Fitzgerald*, 457 U.S. 731, 749-50 (1982) (emphasizing President's constitutionally superior position in conducting foreign affairs); *Johnson v. Eisentrager*, 339 U.S. 763, 789 (1950)

PROTECTED INFORMATION REDACTED

PROTECTED INFORMATION REDACTED

("President is exclusively responsible" for "conduct of diplomatic and foreign affairs"); *Zivotofsky ex rel. Zivotofsky v. Sec'y of State*, No. 07-5347, slip op. at 25 (D.C. Cir. July 23, 2013) (extending the Supreme Court's foreign affairs power jurisprudence to hold that the President exclusively holds the power to recognize foreign governments because that power includes formulating policy toward foreign governments). The Supreme Court has noted that "[t]he Founders in their wisdom made him not only the Commander-in-Chief but also the guiding organ in the conduct of our foreign affairs. He who was entrusted with such vast powers in relation to the outside world was also entrusted by Congress, almost throughout the whole life of the nation, with the disposition of alien enemies during a state of war." *Ludecke v. Watkins*, 335 U.S. 160, 173 (1948) (applying the Alien Enemy Act of 1798, 1 Stat. 577, 50 U.S.C. §§ 21-24 (1798)).

Included within the President's foreign affairs power is his "authority to make 'executive agreements' with other countries, requiring no ratification by the Senate or approval by Congress, this power having been exercised since the early years of the Republic." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 415 (2003). The Supreme Court carefully distinguished "the competence of the President" to enter into executive agreements incident to conduct of diplomatic relations without congressional interference, from the shared treaty power which requires the advice and consent of the Senate. *United States v. Belmont*, 301 U.S. 324, 330 (1937).

In *Zivotofsky*, the Court of Appeals recently examined Congress' interference with the Executive's power to recognize foreign governments. The court voided a law requiring that the Secretary of State mark passports to show "Israel" as the place of birth for those born in Jerusalem, explaining that when Congress, while having the power to regulate passports, legislates in such a way as to infringe on Executive authority, the legislation presents a separation of powers problem. *Id.*, slip op. at 34. The Executive argued that requiring the

16
PROTECTED INFORMATION REDACTED

PROTECTED INFORMATION REDACTED

Secretary of State to issue passports passing on the status of Jerusalem would complicate "a highly sensitive, and potentially volatile, mix of political, juridical and religious considerations . . . ." *Id.*, slip op. at 35-36. Such a policy would provoke uproar throughout the Arab world and damage relations with friendly Arab and Islamic governments. *Id.*, slip op. at 36. Accordingly, where the national security or foreign policy of the United States was affected, deference to the Executive's core function as the "sole organ of the nation in its external relations" precluded any interference by Congress. *Id.*, slip op. at 40 (quoting *Curtiss-Wright*, 299 U.S. at 319).

The required certifications in Section 1028 intrude on this foreign affairs power. Desisting from targeting Ajam requires his transfer to a foreign country. To effect this transfer, the President must engage in sensitive diplomatic negotiations with transferee countries, the product of which is an executive agreement governing the terms of the transfer. *See* 2013 Signing Statement. By conditioning the substance of any agreement with a transferee nation, *see* NDAA § 1028(b)(1)(D), (E), and (F), addressing the nature and conduct of the transferee nation, *see id.* §§ 1028(b)(1)(A), (B), (C), (D), and (E); 1028(c), and imposing requirements for another nation's cooperation with the United States, *see id.* § 1028(b)(1)(F), Congress intrudes upon the President's management of delicate foreign relations. *See Zivotofsky*, slip op. at 39-41.

Congress may counter that it has given the President power to "waive" certain—but not all—of the certification provisions, but the "waiver" provisions are, in fact, alternative certification requirements in Sections 1028(b)(1)(D) and (E). Instead of certifying that there are ample measures in place to block any threat to the United States or its allies, the Secretary of Defense must simply make a different certification—that alternative "*actions*" will be taken to address those objectives. *See* NDAA § 1028(d)(1)(B) (emphasis added). Even under the alternative provisions of Section 1028(d)(1)(D), the Secretary of Defense has to make predictive certifications about the actions taken by other governments and their efficacy upon free-world

17

PROTECTED INFORMATION REDACTED

PROTECTED INFORMATION REDACTED

security, and the President's negotiations with foreign countries is chilled and clouded by the necessity of these certifications.   Under either, alternative, Congress obstructs delicate negotiations with foreign governments, negotiations that – at least as to persons detainable only under the laws of war – are delegated by the Constitution entirely to the President's discretion.

Any such intrusion, even a trivial one, is an unacceptable violation of the separation of powers. Even the trivial requirement that the government submit sealed notices to the Court before exercising unilateral power to transfer Guantánamo detainees was held to be an unconstitutional infringement of the President's foreign affairs power. *See Kiyemba v. Obama* (*Kiyemba II*), 561 F.3d 509, 515 (D.C. Cir. 2009), *cert. denied*, 130 S. Ct. 1880 (2010) (mem.) (holding that the "requirement that the Government provide pre-transfer notice interferes with the Executive's ability to conduct the sensitive diplomatic negotiations required to arrange safe transfers for detainees").   The certification requirements are far more intrusive; the President himself has acknowledged that they significantly impair delicate foreign bargaining and relations between the United States and other nations. *See* 2013 Signing Statement; July 26, 2013 White House Statement (reiterating that the certification requirements "significantly limit[] [the President's] ability to transfer detainees out of Guantanamo, even those who have been approved for transfer").

In sum, the certifications required by Section 1028 unconstitutionally intrude into the "plenary and exclusive" foreign affairs power accorded to the President. *Curtiss-Wright*, 299 U.S. at 320; *see Zivotofsky*, slip op. at 25.   The certifications would dictate the terms of any agreement into which the President might enter to transfer detainees.   In light of the Supreme Court and the D.C. Circuit's instruction that the President retains *exclusive* authority to conduct foreign relations with other countries, especially where matters of national security are concerned, congressional interference by way of the certification procedures is unconstitutional. Accordingly, this Court should grant Petitioner's request for declaratory relief.

18

PROTECTED INFORMATION REDACTED

PROTECTED INFORMATION REDACTED

**D.**    **Section 1028 is an Unconstitutional Bill of Attainder.**

Section 1028 should also be struck as a bill of attainder, prohibited to Congress by Article
I, Section 9.  The test of whether a law constitutes a Bill of Attainder was stated by the Court in
*United States v. Lovett*, 328 U.S. 303 (1946):

> [L]egislative acts, no matter what their form, that apply either to
> named individuals or to easily ascertainable members of a group in
> such a way as to inflict punishment on them without a judicial trial
> are bills of attainder prohibited by the Constitution.

*Id.* at 315.  Section 1028 readily passes the first part of the test: it applies only to the easily

ascertainable members of a particular group, fewer than 200 men still detained at Guantánamo,

and it was enacted to limit their release long after they were identified by capture and detention.

It is equally plain that imprisonment at Guantánamo, after the period in which the

Commander-in-Chief sees any military necessity for it, is punishment.    This is because

imprisonment has traditionally been seen as punishment in bill of attainder jurisprudence:

> Under the "historic" test, courts review the purported punishment
> and determine whether it imposes "punishment traditionally judged
> to be prohibited by the Bill of Attainder Clause." *Nixon* [*v. Admin.*
> *of Gen. Servs.*], 433 U.S. [425] at 475, 97 S.Ct. [2777] at 2806
> [(1977)].    Traditional "impermissible" punishments include,
> among others, death sentences, imprisonment, banishment, and "a
> legislative enactment barring designated individuals or groups
> from participation in specified employments or vocations."

*McMullen v. United States*, 953 F.2d 761, 766 (2d Cir. 1992).

Where Congress imposes novel types of deprivations on individuals, courts use a

functional test: considering whether the deprivations have the purpose to punish, where

"punishment" includes incapacitating a "tainted" person to prevent future misconduct:

> In determining whether punitive or nonpunitive objectives underlie
> a law, *United States v. Brown* established that punishment is not
> restricted purely to retribution for past events, but may include
> inflicting deprivations on some blameworthy or tainted individual

19

PROTECTED INFORMATION REDACTED

PROTECTED INFORMATION REDACTED

> in order to prevent his future misconduct.  381 U.S. [ ] [437] at
> 458-59, 85 S.Ct [ ] [1707] at 1720 [(1965)].   This view is
> consistent with the traditional purposes of criminal punishment,
> which also include a preventive aspect.

*Nixon v. Admin. of Gen. Servs.*, 433 U.S. at 476 n.40 (1977).

The deprivation inflicted on Ajam is squarely within the boundaries of traditional punishment: he is held in prison.  And the requirements of Section 1028 are premised not on any definable conduct or judicial finding as to Ajam, but on the happenstance of his presence at a particular prison.  Section 1028 continues that punishment indefinitely by limiting the terms under which the Commander may effect a release.  The ostensible purpose of Section 1028, to prevent Petitioner and others at Guantánamo from causing future harm, does not make it any less punitive.[9]  As noted in *Nixon*, prevention of future misconduct is a goal of criminal punishment. The determining fact here is the incarceration itself.

Section 1028 does not provide a general punishment for a class of activity into which some conduct by Ajam falls.  He has not been tried and found guilty of a crime.  He was detained solely as an enemy belligerent, and is now detained long after the Commander thought was warranted.  In Section 1028, Congress has attempted simply to punish him, and with what may amount to life-long incarceration.

*Kiyemba v. Obama* (*Kiyemba III*), 605 F.3d 1046 (D.C. Cir. 2010), rejected a bill of attainder challenge by Guantánamo detainees but in a critically different context.  In *Kiyemba III*, Uighur detainees contended a law forbidding Guantánamo detainees from entering the United States was a bill of attainder.  (A similar provision is carried over in the 2013 NDAA, at Section 1027.)  The Court of Appeals rejected the contention under the proposition that the Uighurs had no right to enter the United States in the first place:

---

[9] There has never been any judicial determination that Ajam has caused harm to anyone, or is likely to do so.

20

PROTECTED INFORMATION REDACTED

> Petitioners also argue that the new statutes are unlawful bills of attainder. The statutory restrictions, which apply to all Guantanamo detainees, are not legislative punishments; they deprive Petitioners of no right they already possessed. *See Nixon* [433 U.S. at 475 (1977)].

*Kiyemba III*, 605 F.3d at 1048.[10] But Ajam does not seek release in the United States. He seeks freedom from unlawful detention, a "right [he] already possessed" under the privilege of habeas corpus, and a right that was blocked by Congress's intrusion. Because Section 1028 is punitive, it may be voided as a bill of attainder.

### E.    Petitioner Has Standing to Request Declaratory Relief.

What has been said thus far is largely, if not completely, consistent with positions that the President has asserted himself. *See* 2013 Signing Statement; 2012 Signing Statement; July 26, 2013 White House Statement; May 1, 2013 White House Statement. Attempting to forecast what, if any, opposition the government might bring to this motion, Petitioner turns to his standing to bring it.

#### 1.    Standing Generally.

A prisoner challenging a statute that was written uniquely for a particular prison, and that expressly limits the means by which he might be released, is not speculating. He attacks legislation targeted directly at him, with the intent and effect of limiting his own freedom. It is difficult to imagine a litigant more squarely and personally situated to raise a concrete "case or controversy."

---

[10] Review of this decision was never completed, as the case was ultimately dismissed as moot after the last Uighur received an offer of resettlement in 2009, and the Supreme Court denied certiorari. *See Kiyemba v. Obama (Kiyemba IV)*, 131 S. Ct. 1631 (2011) (denying certiorari). The Uighurs argued that the habeas privilege demanded the power of the Court to direct release, *see Boumediene*, 553 U.S. at 771, and that the only place in which the Court could direct that release was the place where, in law, the Uighurs already were: that is, the situs of the Court having jurisdiction. This proposition, largely accepted by Circuit Judge Rogers, concurring in the judgment, was not reviewed by the Supreme Court. *See Kiyemba IV*, 131 S. Ct. 1631 (denying certiorari).

PROTECTED INFORMATION REDACTED

"Standing," in the constitutional sense, proceeds from Article III of the Constitution, which limits this Court's jurisdiction to "cases and controversies." *Allen v. Wright*, 468 U.S. 737, 751 (1984). The doctrine embraces judicially self-imposed limits on the exercise of federal jurisdiction, such as the general prohibition on a litigant's raising another person's legal rights and the rule barring adjudication of generalized grievances. *Id.* Courts require that a litigant "allege[] such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) (internal quotation marks omitted). The focus on the litigant's personal stake assures the concrete adversity of the parties and sharpens the presentation of issues for the Court, to ensure illumination of difficult constitutional law questions. *Baker v. Carr*, 369 U.S. 186, 205 (1962). This personal stake is to be distinguished from a generalized grievance or a speculative injury. The former confers standing; the latter does not.

At the threshold, it is self-evident that this case presents none of the problems of the usual "speculative injury" case – for example, that Amnesty International officials *might* be spied upon, which the Supreme Court held was not a sufficiently concrete injury, *see Clapper v. Amnesty Int'l*, 133 S. Ct. 1138 (2012), or that members of an environmental group *might* visit national forests compromised by regulations authorizing commercial activity. *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009). Ajam's injury is real, and is felt personally each day.

2.    **Petitioner Has Standing to Challenge a Violation of the Separation of Powers.**

That petitioner is not a member the Executive Branch does not bar him from challenging an unconstitutional invasion of the prerogatives of the Executive. In *INS v. Chadha*, 462 U.S. 919 (1983), the Supreme Court held that an immigrant had standing to challenge an unconstitutional invasion of presidential powers by Congress when, as here, that invasion caused him direct harm. The Court rejected the "contention that Chadha lacks standing because a

22

PROTECTED INFORMATION REDACTED

consequence of his prevailing will advance the interests of the Executive Branch in a separation of powers dispute with Congress, rather than simply Chadha's private interests." *Id.* at 935-36. Like Chadha, Ajam can demonstrate "injury in fact and a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury." *Id.* at 936; *see also Boumediene,* 553 U.S. at 743 ("Because the Constitution's separation-of-powers structure, like the substantive guarantees of the Fifth and Fourteenth Amendments, protects persons as well as citizens, foreign nationals who have the privilege of litigating in our courts can seek to enforce separation-of-powers principles.") (internal citations omitted).

In an earlier decision in the *Zivotofsky* litigation, the Court of Appeals held that an individual had standing to challenge an inter-branch conflict between Congress and the Executive. *Zivotofsky ex rel. Zivotofsky v. Sec'y of State*, 444 F.3d 614 (D.C. Cir. 2006).[11] Challenging the Secretary of State's refusal to list her son's birthplace as "Israel" on his U.S. passport, the petitioner raised the question as to whether Congress (which has power over passports) or the Executive (which may receive ambassadors and therefore has sole power to recognize sovereigns) had Constitutional authority. Senior Circuit Judge Randolph concluded that Zivotofsky had standing; citing to *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), Judge Randolph concluded that Zivotofsky's case fell under the rule that "[w]hen a plaintiff is the 'object of [government] action (or foregone action) ... there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Id.* at 618 (citing *Lujan*, 504 U.S. at 561-62). As a Guantánamo detainee, Ajam is, of course, one of the few objects of the NDAA's transfer restrictions. *See also Bond v. United States*, 131 S. Ct. 2355, 2363-64 (2011) (criminal defendant had standing to bring a Tenth Amendment challenge to federal statute; Court rejects argument that such a right can be

---

[11] The question in this case ultimately turned not on whether Zivotofsky had standing, but on whether his claim presented a political question. The Supreme Court held that it did not and remanded for consideration on the merits. *Zivotofsky ex rel. Zivotofsky v. Clinton*, 132 S. Ct. 1421 (2012).

PROTECTED INFORMATION REDACTED

vindicated only by a state). In *Bond*, the Court noted that "an individual has a direct interest in objecting to laws that upset the constitutional balance between the National Government and the States when the enforcement of those laws causes injury that is concrete, particular, and redressable." *Id.* at 2365. Accordingly, Petitioner has standing to challenge congressional intrusion into the President's powers.

> 3. **Petitioner Meets the Constitutional Test for Standing Because He Suffers a Concrete Injury, Fairly Traceable to the Statutory Barriers in Section 1028 of the NDAA, and Voiding the Statute Will Redress the Injury.**

The general context laid out above informs the particular test for constitutional standing, which requires that the litigant show that he suffers (1) a concrete, particularized, and actual or imminent injury; (2) fairly traceable to the challenged action; and (3) redressable by a favorable ruling. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). There is no question that Petitioner is detained by the Executive, that the Executive has declared that it would like to release him, that release ▮▮▮▮▮▮▮▮ when the certification requirement first appeared in the 2011 NDAA, that release has since failed to occur, and that the certification has never been delivered. As a result, Petitioner has standing to challenge Section 1028.

> a. **Petitioner suffers a concrete, actual injury.**

Petitioner suffers at least two concrete injuries from the certification barrier raised by Section 1028 of the NDAA, each of which must be considered in the context of Ajam's constitutional right to be free from unlawful imprisonment, *see Boumediene*, 553 U.S. at 771 (holding that a prisoner in executive detention enjoys the privilege of habeas corpus), and the fact that the only lawful basis for his imprisonment—discretionary targeting by the President—is one that the President himself desires to remove. *First*, as applied to a prisoner like Ajam who has been cleared by the President's Task Force, the statute on its face causes a concrete harm. By limiting the President's ability to desist from targeting a cleared prisoner, Section 1028 necessarily limits the prisoner's opportunity to be released. That impairment is a sufficient

PROTECTED INFORMATION REDACTED

injury to raise a case or controversy. *See Kiyemba II*, 561 F.3d at 515 (explaining that imposing a notice requirement before transferring a prisoner created a *potential* for interference in delicate diplomatic negotiations), and discussion, *infra*. *Second*, the record of this case shows that the enactment of Section 1028 ███████████████████████████, and since that time has actually caused Petitioner's continued detention. This Court can redress both injuries by striking down Section 1028 as unconstitutional.

### i   Impairment of the opportunity for release of any prisoner cleared for release is a present injury.

"An identifiable trifle is enough for standing to fight out a question of principle." *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 690 (1973). Many cases establish that diminishing access to a concrete benefit, even a procedural right, is an injury in fact and thus creates standing. Cases discussing procedural injuries illuminate this point. In *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1103 (D.C. Cir. 2005), a prisoner challenged parole hearing procedures that foreclosed legal representation, which made it more difficult for him to obtain the benefit of parole. He did not have to show that having a representative at his parole hearing would result in a different substantive outcome. The procedural injury constituted the injury. The court analogized to equal protection cases in which the injury inquiry considers only whether the government erected barriers to make it more difficult for a person to obtain a benefit, not the ultimate ability to obtain the benefit. *Id.* at 1102. In *United States v. Lopez*, 650 F.3d 952, 960 n.7 (3d Cir. 2011), prisoners complained that downward departures in their sentencing ranges were unavailable to them because fast-track programs offering those departures did not exist in the districts where they were prosecuted. The court held that the prisoners had standing to challenge the Department of Justice's failure to implement fast-track sentencing procedure in their districts, without any showing that those procedures would result in shorter sentences for them. The imposition of procedural risks was a concrete injury.

The analytical framework applied to equal protection cases is also applicable here.  In *Ne. Fla. Chapter, Associated Gen. Contractors of Am. v. Jacksonville,* 508 U.S. 656, 665 (1993), contractors challenged an ordinance giving preferential treatment to minority-owned business. They were not obliged to show that they would have been awarded contracts.  Injury in fact arose from the mere inability to compete on an equal footing resulting from the imposition of the barrier.  In *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995), the Court reaffirmed this principle, noting that "Adarand need not demonstrate that it has been, or will be, the low bidder on a Government contract.  The injury in cases of this kind is that a "discriminatory classification prevent[s] the plaintiff from competing on an equal footing."  In *Gratz v. Bollinger*, 539 U.S. 244, 261-62 (2003), the Supreme Court held that challengers to affirmative action policies established standing because the policies denied them the opportunity to compete for admission on an equal basis.  *Accord Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 281 n.14 (1978) (same).  In the voting context, the dilution of a person's constitutional right to vote (one person, one vote) produced a legally cognizable injury.  *Baker*, 369 U.S. at 208; *accord Carey v. Klutznick*, 637 F.2d 834, 838 (2d Cir. 1980) ("The individual plaintiffs in this case have alleged concrete harm in the form of dilution of their votes . . . thus establishing their standing.").  These cases stand for the proposition that when a person sustains a diminished opportunity to enjoy a constitutional right, he has sustained a personal injury sufficient to establish standing.

Just as in those cases, Petitioner's diminished opportunity to be set free creates an injury in fact.  This right is sharpened by its constitutional context.  As a prisoner in executive detention, Petitioner enjoys the privilege of *habeas corpus*, *Boumediene*, 553 U.S. at 771, that is, the right to be released unless the President points to a legal justification for his detention.  *Id.* The President had previously pointed to Ajam's (contested) status as an enemy belligerent, but once the President decided to desist from targeting Ajam with military force, the only legal justification for his continued detention disappeared.  *Id.*  Thus, the mere existence of a

PROTECTED INFORMATION REDACTED

Congressional limitation, like Section 1028, on the release *process* is a concrete injury, felt presently and particularly by Ajam, as a cleared detainee.  *See Kiyemba II*, 561 F.3d at 515 (explaining that *any* restrictions on detainee transfers makes it more difficult for the President to arrange safe transfers for detainees and thus ultimately release the detainees); July 26, 2013 White House Statement (explaining that certification requirements significantly limit the President's ability to transfer detainees, even for detainees cleared for release).

> ii    **The 2011 NDAA and its successors have directly impaired Ajam's actual release.**

Ajam's particular grievance is not merely the loss of the opportunity of release; his facts show that Congressional intrusion halted his actual release.  Of course, Petitioner's physical detention implicates the most fundamental of liberty interests.  *Hamdi*, 542 U.S. at 529 ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action.").  As the Marshall Declaration shows, Petitioner's release ██████████████████████████████████████ was halted in its tracks by the 2011 NDAA.  It has been halted ever since.

> b.   **Petitioner's injuries are directly traceable to the certification requirements under the NDAA.**

The second prong of the standing test focuses on causation.  While the alleged injury must be fairly traceable to the challenged conduct, *Lujan*, 504 U.S. at 560, the injury need not flow exclusively or even directly from the challenged action, *Tozzi v. U.S. Dep't of Health & Human Servs.*, 271 F.3d 301, 308 (D.C. Cir. 2001).  All that is required is that the challenged conduct plays a substantial role in the resulting injury.  *Id.*  There is no requirement to prove causation beyond a reasonable doubt or by clear and convincing evidence.  *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003).

PROTECTED INFORMATION REDACTED

i      **Barriers to release are self-evidently caused by the statute.**

Because diminished opportunity to access the constitutional right to release is necessarily an injury in fact to Ajam, causation is self-evident.  Section 1028 of the 2013 NDAA, and nothing else, imposes certification requirements that limit the President's power to effect release. 2013 NDAA § 1028(b); 2013 Signing Statement; July 26, 2013 White House Statement; May 1, 2013 White House Statement.  This is undisputable on the face of the statute; it is the *purpose* of the statute.  Therefore the injury Petitioner complains of is directly traceable to Section 1028 of the 2013 NDAA.

ii      **The record shows that the certification requirements scuttled Petitioner's imminent release.**

Petitioner's continued detention today was *actually* caused, directly and obviously, by the 2011 NDAA, and its successors.  As set out in the statement of undisputed material facts, the circumstances of Ajam's release negotiations demonstrate that the certification requirement prevented his release, and that his continued detention is fairly traceable to Congress's enactment of the certification requirements.  Sometime prior to November 25, 2009, the President's Guantánamo Review Task Force cleared Ajam "for transfer or release."  Marshall Decl. at ¶ 3. This was the result of careful, multi-agency determination by the Commander-in-Chief that targeting Ajam with military force was no longer in the tactical interests of the United States in connection with ongoing military activities.  Later, a Department of Justice official informed Ajam's counsel that ███████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████

On September 1, 2010, officials of the Department of State informed Ajam's counsel that
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

PROTECTED INFORMATION REDACTED

During a January 27, 2011 conference call, a State Department official stated that ▮▮▮

Ajam was never released.  When his transfer ▮▮▮▮▮, government representatives specifically identified only one complication delaying Ajam's transfer: the certification requirements of the NDAA.  *Id.*  What is more, since the enactment of the NDAA, the President, acting on his own authority, has failed to transfer a single prisoner who has not been convicted of a crime or the subject of a successful habeas petition.  *See The Guantánamo Docket* (tracking prisoner transfers and deaths).  In 2011, more prisoners died than were released.  *Id.*

Today, Section 1028 continues to chill the Executive's exercise of his sole Constitutional prerogative to determine that he should desist from the exercise of military force against Ajam, as a specific target, because foreign governments, being aware of the requirements, are dissuaded from negotiating with the President.  It is of no moment that a third country must be willing to accept him for transfer.  The certification requirements in Section 1028 remain a substantial factor in Petitioner's continued detention, even if they are not the only factor.

The cases demonstrate that an indirect injury will suffice for standing purposes.  In *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 74-78 (1978), the Supreme Court held that plaintiffs had standing to challenge the Price-Anderson Act on the grounds that the statute, by limiting liability for nuclear plants, contributed to plaintiffs' environmental injuries.

PROTECTED INFORMATION REDACTED

PROTECTED INFORMATION REDACTED

In *Tozzi*, the Court of Appeals held that a PVC manufacturer had standing to contest an agency's listing of dioxin as a carcinogen, even though other factors may have contributed to a decline in sales of its products.  271 F.3d at 309.  The classification as a carcinogen was at least a "substantial factor" in the decisions of state and local agencies to regulate dioxin or of healthcare companies to reduce or end purchases of PVC plastics.  *Id.*  Section 1028 remains a substantial factor in Petitioner's continued detention; as a State Department official explicitly told Petitioner's counsel, ██████████████████████████████████████████████████████
██████████████████████████████████

### c. Striking down Section 1028 will redress Petitioner's injuries.

The third prong of the standing inquiry focuses on redressability.  There must be a "substantial probability" that the relief requested will redress the injury claimed.  *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 (1977).  Petitioner need not negate "speculative and hypothetical possibilities" to demonstrate the likely effectiveness of judicial relief. *Duke Power Co.*, 438 U.S. at 78.

### i The injury caused by the statutory barriers erected by Section 1028 of the NDAA will be redressed by voiding it.

Because the enactment of Section 1028 of the NDAA necessarily harms any prisoner cleared for release, it is self-evident that the harm caused by the statute will be redressed by voiding it.

### ii The record in this case amply demonstrates that striking down Section 1028 of the NDAA will redress Petitioner's continued detention.

Even if the injury had to be narrowly construed as actual detention, as opposed to the loss of opportunities for release, Petitioner's continued detention is redressable by voiding Section 1028 of the NDAA.  In 2011, when transfer ██████████, the government specifically pointed to only one impediment: the NDAA's certification requirements.  *See* Marshall Decl. at ¶ 6.

PROTECTED INFORMATION REDACTED

PROTECTED INFORMATION REDACTED

Voiding Section 1028 of the 2013 NDAA as to cleared prisoners would relieve the Executive of the impediment upon its decision to desist from targeting, unhampered by congressional constraints.

The Supreme Court has found redressability where a chain of events was far less concrete. In *Arlington Heights*, a developer challenged the denial of a rezoning request because the denial had discriminatory effects.   429 U.S. at 260.   The Supreme Court ruled that an injunction compelling the rezoning would redress the developer's injury, even though the injunction could not *guarantee* that the housing complex would be built.   *Id.* at 261.   The Court explained:

> An injunction would not, of course, guarantee that Lincoln Green will be built. MHDC would still have to secure financing, qualify for federal subsidies, and carry through with construction.  But all housing developments are subject to some extent to similar uncertainties.  When a project is as detailed and specific as Lincoln Green, a court is not required to engage in undue speculation as a predicate for finding that the plaintiff has the requisite personal stake in the controversy.  *Id.* at 261-62.

So, too here the procuring of a third country to accept Ajam is not "undue speculation," given that ██████████████████████████████ before.  The Supreme Court, in *Arlington Heights*, ruled that the developers had standing even after the suspension of a federal housing assistance program left the project in doubt.  *Id.* at 261 n.7.  The parallel here is apt: Ajam would have standing even if there were other barriers to his eventual release.  There is a substantial probability that the removal of Section 1028's certification requirements will at long last end a national embarrassment: that for more than three years, our government has been unable to free a man the government itself has cleared for release.

## CONCLUSION

For the foregoing reasons, Petitioner's motion for partial summary judgment should be granted.

PROTECTED INFORMATION REDACTED

PROTECTED INFORMATION REDACTED

Dated this _16th_ day of August, 2013.

Respectfully submitted,

_____
David S. Marshall (Pursuant to L.Cv.R. 83.2(g))
Counsel for Petitioner
1001 Fourth Avenue, 44th Floor
Seattle, WA 98154-1192
Telephone: (206) 826-1400
Facsimile: (206) 389-1708
dmarshall@DavidSMarshall.com

32
PROTECTED INFORMATION REDACTED