# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AHMED ADNAN AHJAM, | ) |
| Petitioner, | ) |
| v. | ) Civil No. 09-745 (RCL) |
| BARACK OBAMA, *et al.*, | ) UNDER SEAL |
| Respondents. | ) |

*Let this redacted copy be filed.*

*Kogu C. Lamberth*

*U. S. D. J. 4/8/14*

## MEMORANDUM OPINION

Petitioner Ahmed Adnan Ahjam,[1] a Syrian national, has been detained as an enemy belligerent at the detention facility at Guantanamo Bay, Cuba since 2002. In 2009, pursuant to an Executive Order, a federal task force identified Mr. Ahjam as a candidate for transfer from the detention facility and resettlement in a new country. Mr. Ahjam filed the present motion to challenge the 2013 and 2014 National Defense Authorization Acts, which impose prerequisites for transfers of Guantanamo detainees, as unconstitutional interferences by Congress into the President's control of foreign affairs. Upon consideration of the petitioner's Motion for Partial Summary Judgment [1748], the government's Opposition thereto [1788], and the petitioner's Reply [1794], the Court DENIES the petitioner's motion.

## I. BACKGROUND

Two days after taking office, on January 22, 2009, President Barack Obama issued Executive Order 13492 establishing the Guantanamo Review Task Force. Exec. Order No. 13492, 74 Fed. Reg. 4897 (Jan. 22, 2009). The Task Force—headed by the Attorney General

---

[1] The spelling of the petitioner's name varies throughout the pleadings. For purposes of this opinion, the Court will use the spelling reflected on the Court's docket.

and including the Secretaries of Defense, State, and Homeland Security, as well as the Director of National Intelligence and the Chairman of the Joint Chiefs of Staff—was charged with undertaking "a prompt and thorough review of the factual and legal bases for the continued detention of all individuals currently held at Guantanamo, and of whether their continued detention is in the national security and foreign policy interests of the United States and in the interests of justice." *Id*. at 4898. For each detainee, the Task Force was to determine the propriety of transfer, release, prosecution, or some other disposition consistent with the laws and foreign policy interests of the United States. *Id*. at 4899. To facilitate transfers, the Order directed the Secretary of State to "expeditiously pursue and direct such negotiations and diplomatic efforts with foreign governments as are necessary and appropriate." *Id*. The Order's directives were "subject to the availability of appropriations" and explicitly did not "create any right or benefit, substantive or procedural." *Id*. at 4899–900.

On January 22, 2010, the Task Force published its final report identifying 126 detainees as candidates for transfer to receiving countries. Guantanamo Review Task Force, Final Report, at ii (2010), *available at* http://www.justice.gov/ag/guantanamo-review-final-report.pdf (last visited March 19, 2014). Petitioner Ahjam was one of the transfer candidates. The effort to effect these transfers has involved "the highest levels in the administration." *Id*. at 26. The President, Vice President, Secretary of State, Attorney General, and Secretary for Homeland Security have worked to negotiate transfers through discussions with their foreign government counterparts. *Id*. The Secretary of State appointed an experienced career diplomat as the Special Envoy for Closure of the Guantanamo Bay Detention Facilities. *Id*. Despite—or perhaps because of—these intense efforts, the Task Force warned that the transfer process can be "lengthy and complicated" and "often has been influenced by political and other issues in

2

potential resettlement countries (e.g., public perceptions of current and past U.S. detention policies), third-country views (and sometimes pressure) with respect to detainee resettlement, and public views of the Guantanamo detention facility generally." *Id*. at 27.

For each fiscal year from 2011 through 2013, the National Defense Authorization Acts ("NDAA") suspended funding for transfers of Guantanamo detainees unless the Secretary of Defense, with the concurrence of the Secretary of State, made extensive certifications to Congress regarding the risk posed by the detainee and the security measures taken by receiving countries. Each year, the President issued signing statements noting that the provisions "interfere[d] with the authority of the executive branch to make important and consequential foreign policy and national security determinations regarding whether and under what circumstances such transfers should occur in the context of an ongoing armed conflict." Statement by the President on H.R. 6523, *available a*t http://www.whitehouse.gov/the-press-office/2011/01/07/statement-president-hr-6523 (last visited Mar. 19, 2014).

The petitioner's initial motion challenged the certification provisions of the FY2013 NDAA. While that motion was pending, on December 26, 2013, the President signed the NDAA for Fiscal Year 2014 into law. The 2014 Act, which became effective on January 15, 2014, expressly repealed the certification provisions of prior NDAA and instead requires a "determination" by the Secretary of Defense that (1) "the individual is no longer a threat to the national security of the United States," (2) "actions that have been or are planned to be taken will substantially mitigate the risk of such individual engaging or reengaging in any terrorist or other hostile activity," and (3) "the transfer is in the national security interest of the United States." National Defense Authorization Act for Fiscal Year 2014, Pub. L. No. 113-66, § 1035, 127 Stat 672 (2013). In making the determination, the statute prescribes eight factors to guide the

Secretary's decision. *Id.* § 1035(c). The Secretary of Defense is also required to notify "Congress of a [transfer] determination . . . not later than 30 days before the transfer or release of the individual." *Id.* § 1035(d).

In signing the Act, the President acknowledged that the FY2014 NDAA allowed "additional flexibility to transfer detainees abroad by easing rigid restrictions that have hindered negotiations with foreign countries and interfered with executive branch determinations" but noted that the Act "did not eliminate all of the unwarranted limitations on foreign transfers." Statement by the President on H.R. 3304, *available at* http://www.whitehouse.gov/the-press-office/2013/12/26/statement-president-hr-3304 (last visited Mar. 19, 2014) (hereinafter 2014 Signing Statement). The President also emphasized that the new provisions were coextensive with his own standards for detainee transfers, remarking that "even in the absence of any statutory restrictions, my Administration would transfer a detainee only if the threat the detainee may pose can be sufficiently mitigated and only when consistent with our humane treatment policy." *Id.* Finally, the President stated that where "the restrictions on the transfer of Guantanamo detainees . . . operate in a manner that violates constitutional separation of powers principles, my Administration will implement them in a manner that avoids the constitutional conflict." *Id.*

**A. Petitioner's Transfer Negotiations**

As forecast in the Task Force Report, the negotiations to transfer Mr. Ahjam have been lengthy and complicated. Mr. Ahjam petitioned this Court for a writ of habeas corpus in 2005. After Mr. Ahjam was approved as a transfer candidate in 2009, the Court stayed the habeas proceedings pending the outcome of the transfer negotiations. Memorandum & Order, ECF No. 1398 (Mar. 30, 2010)

[REDACTED] Efforts to finalize a transfer are ongoing. Because the requirements of the FY2014 NDAA parallel the considerations that guide the President's transfer decisions, the Special Envoy for Guantanamo Detention Closure has averred that the government does not

expect the FY2014 NDAA "to be an independent barrier to Mr. Ahjam's transfer." Resp't Opp., Ex. 2 (Decl. of Paul M. Lewis, Jan. 9, 2014), at ¶ 7 [hereinafter Lewis Decl.].

## II.     ANALYSIS

Petitioner Ahjam seeks declarations that (1) the certification and determination requirements unconstitutionally intrude upon the President's control of foreign affairs, and (2) the NDAA is an unconstitutional bill of attainder. For the reasons outlined below, the Court holds that Mr. Ahjam lacks standing to assert the former argument and finds the latter without merit.

### A.     Mr. Ahjam Lacks Standing to Challenge the Certification Provisions of the NDAA

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). The standing doctrine enforces this limitation by "identify[ing] those disputes which are appropriately resolved through the judicial process." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). Demonstrating standing, or the existence of a case or controversy, requires (1) an "injury in fact" that is (2) "fairly traceable to the challenged action of the defendant" and is (3) likely to be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotations and citations omitted).

Proof of these elements is "indispensable" to every case, *id.*, and federal courts must always demand "strict compliance with this jurisdictional standing requirement," *Raines*, 521 U.S. at 819. Where, however, a plaintiff seeks a decision as to the constitutionality of an action taken by a co-equal branch of government, judicial scrutiny of standing is "especially rigorous." *Raines*, 521 U.S. at 819–20. This is so because, consistent with the bedrock principle of

6

separation of powers, judging the constitutionality of executive or congressional action is "the gravest and most delicate duty that [courts are] called upon to perform." *Rostker v. Goldberg*, 453 U.S. 57, 64 (1981). Because he has no legally protected interest in the relief he seeks, Mr. Ahjam's motion cannot survive this "especially rigorous" scrutiny.

    *i.    Injury-In-Fact*

    The first prong of the standing inquiry, "injury in fact," requires (1) an "invasion of a legally protected interest" that is (2) "concrete and particularized" and (3) "actual or imminent." *Lujan*, 504 U.S. at 560. Establishment of an injury in fact "is a hard floor of Article III jurisdiction." *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009). Mr. Ahjam's challenge fails to make it off the ground because he cannot show the barest minimum required for an injury in fact—a "judicially cognizable interest," *Bennett v. Spear*, 520 U.S. 154, 167 (1997).

    The Authorization for Use of Military Force grants the President authority "to use all necessary and appropriate force against those . . . persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001 . . . in order to prevent any future acts of international terrorism against the United States by such . . . persons." Pub. L. 107–40, § 2(a), 115 Stat 224 (2001). The Executive's authority is not unrestricted, however. The "privilege of habeas corpus entitles the prisoner to a meaningful opportunity to demonstrate that he is being held pursuant to the erroneous application or interpretation of relevant law." *Boumediene v. Bush*, 553 U.S. 723, 779 (2008) (internal citations and quotations omitted). The writ of habeas corpus remains the sole means by which Guantanamo detainees may challenge the legality of their detention. Against this background, Mr. Ahjam asserts that his "constitutional right to be free," Pet.'s Mot. Summ. J. 24, is a legally protected interest sufficient to support his standing to challenge the NDAA certification provisions. The Court disagrees.

7

As a threshold matter, barring a successful habeas petition, the Constitution confers no "right to be free," *id.* at 24, upon enemy belligerents detained at Guantanamo. Mr. Ahjam's reasoning to the contrary is based in his fundamental misunderstanding of Executive Order 13492 and the subsequent Task Force Report. Though Mr. Ahjam fashions the Order and the Report as an Executive decision to "cease targeting [Mr. Ahjam] with military force," *id.* at 1, neither document evidences any such decision. The Executive Order communicates the President's command that the Executive Branch review whether "the continued detention of all individuals currently held at Guantanamo . . . is in the national security and foreign policy interests of the United States," 74 Fed. Reg. at 4898, and accordingly, the Task Force Report identifies certain detainees as candidates for *transfer*. The *transfer* designation is key, especially in light of Mr. Ahjam's claim that he is a "man the government itself has cleared for *release*." Pet.'s Mot. Summ. J. 31 (emphasis added). Both the Order and the Report distinguish between transfer and release. *See* 74 Fed. Reg. at 4899 (ordering review of detainees for transfer *or* release) (emphasis added); Task Force Rep. at 7 (repeating same). Not a single detainee was cleared for release, which requires a unanimous finding that a detainee "does not pose an identifiable threat to the national security of the United States." Task Force Rep. at 7 n.5. Far from the release determination claimed by Mr. Ahjam, clearance for transfer merely signals the commencement of a process that "takes time and requires extensive diplomatic efforts." Task Force Rep. at 15; *see also id.* at 27 (describing the transfer process as "lengthy and complicated" and noting that the outcome "often has been influenced by political and other issues in potential resettlement countries.").

Diplomacy and foreign relations fall within the "plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations."

*United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319-20 (1936). Indeed, courts have "long recognized the President's presumptive dominance in matters abroad." *Zivotofsky ex rel. Zivotofsky v. Sec'y of State*, 725 F.3d 197, 211 (D.C. Cir. 2013); *see also, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring) (President bears the "vast share of responsibility for the conduct of our foreign relations."); *Johnson v. Eisentrager*, 339 U.S. 763, 789 (1950) (noting that the President is "exclusively responsible" for "conduct of diplomatic and foreign affairs"); *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 104 F.3d 1349, 1353 (D.C. Cir. 1997) ("By long-standing tradition, courts have been wary of second-guessing executive branch decision involving complicated foreign policy matters."). The law does not recognize any interest of Mr. Ahjam in the Executive's diplomacy with foreign nations.

Moreover, the Task Force Report emphasizes that "a decision to approve a detainee for transfer does not equate to a judgment that the government lacked legal authority to hold the detainee." Task Force Rep. at 15. Despite having reliable evidence that many detainees "engaged in conduct providing a lawful basis for . . . detention," the Task Force "nonetheless considered these detainees for transfer from a threat perspective, in light of their limited skills, minor organizational roles, or other factors." *Id.* The Report, therefore, does nothing to defeat the fact that absent a contrary judicial or Executive determination, Mr. Ahjam remains a lawfully-detained enemy belligerent. Given that fact, the transfer decision is akin to a decision on whether to commute a long-term sentence of a validly-convicted inmate, which "generally depends not simply on objective factfinding, but also on purely subjective evaluations and on predictions of future behavior by those entrusted with the decision." *Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458, 464 (1981); *see also* Task Force Rep. at 17 ("The [transfer] decision

9

reflects the best predictive judgment of senior government officials, based on the available information, that any threat posed by the detainee can be sufficiently mitigated through feasible and appropriate security measures in the receiving country."). As in a commutation decision, the President "can deny the requested relief for any constitutionally permissible reason or for no reason at all." *Dumschat*, 452 U.S. at 466 (Brennan, J., concurring). Such unfettered discretion does not lend itself to judicial review, and thus, does not create a protectable liberty interest.

Finally, Mr. Ahjam's "right to be free" cannot be grounded in the Executive Order, which by its terms, "does not, create any right or benefit, substantive or procedural," 74 Fed. Reg. at 4900; *see also Meyer v. Bush*, 981 F.2d 1288, 1297 n.7 (D.C. Cir. 1993) ("An Executive Order devoted solely to the internal management of the executive branch-and one which does not create any private rights-is not, for instance, subject to judicial review.").

The failure to establish a legally protected interest forecloses each of Mr. Ahjam's injury-in-fact arguments. First, citing a number of cases examining violations of the Equal Protection Clause, Mr. Ahjam argues that "when a person sustains a diminished opportunity to enjoy a constitutional right, he has sustained personal injury sufficient to establish standing." Even assuming the truth of that statement, the distinguishing factor between equal protection cases and Mr. Ahjam's case is the existence of a constitutional right. The plaintiffs in each of the cases cited by Mr. Ahjam alleged an invasion of their right to compete on an equal footing with others—a right conferred by the Fourteenth Amendment to the Constitution. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995). In contrast, Mr. Ahjam has no constitutional or statutory right to a transfer.

Second, the lack of a legally protected interest bars Mr. Ahjam's argument that the "imposition of procedural risks [is] a concrete injury." Pet.'s Mot. Summ. J. 25. *See Summers v.*

10

*Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing.").

Finally, Mr. Ahjam seeks to establish injury by pointing to the 30-day notice requirement, which he argues could require him to remain detained for up to 30 days after the President gives final approval for his transfer. But this reasoning fails because he has no right to a transfer in the first instance—it is entirely within the discretion of the Executive. The President could, for example, reverse the transfer immediately if he determined that the transfer no longer served the interests of the United States. Absent a constitutional or statutory basis to do so, it is not the place of the judiciary to police the discretion of the President. Additionally, on the current facts, this argument is too speculative to establish a concrete injury. Petitioner has not received a final decision on his transfer, and the President could, consistent with his signing statement, "implement [the NDAA] in a manner that avoids . . . constitutional conflict," 2014 Signing Statement, perhaps by making Mr. Ahjam's transfer effective thirty days after the decision is reached. And, given the extensive logistics involved in resettling Guantanamo detainees, this 30-day period would likely be concurrent with the planning for Mr. Ahjam's final transfer.

In sum, Mr. Ahjam has failed to demonstrate a judicially cognizable interest sufficient to establish standing.

## B. The 2014 NDAA Is Not An Unconstitutional Bill of Attainder

"[L]egislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial are bills of attainder prohibited by the Constitution." *United States v. Lovett*, 328 U.S. 303, 315 (1946); *see also* U.S. Const. art. I, § 9, cl. 3. This prohibition serves "as an

implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function[.]" *United States v. Brown*, 381 U.S. 437, 442 (1965).

Because the Bill of Attainder Clause "reaches only statutes that inflict punishment," *Selective Serv. Sys. v. Minnesota Pub. Interest Research Grp.*, 468 U.S. 841, 851 (1984), it is unnecessary to delve into the intricacies of Mr. Ahjam's argument on this issue. The precedent in this Circuit is clear: military detention is not punishment. As the Circuit stated in *Ali v. Obama*

> The purpose of military detention is to detain enemy combatants for the duration of hostilities so as to keep them off the battlefield and help win the war. Military detention of enemy combatants is a traditional, lawful, and essential aspect of successfully waging war. . . . [M]ilitary detention during wartime is neither a punishment nor an act of vengeance, but merely a temporary detention which is devoid of all penal character.

736 F.3d 542, 545 (D.C. Cir. 2013) (internal quotations and citations omitted). And, in a case examining a statute forbidding any funds for transfers of Guantanamo detainees to the United States, the Circuit held

> The statutory restrictions, which apply to all Guantanamo detainees, are not legislative punishments; they deprive petitioners of no right they already possessed.

*Kiyemba v. Obama*, 605 F.3d 1046, 1048 (D.C. Cir. 2010). As such, the provisions of the NDAA do not fall within the purview of the Constitution's prohibition on bills of attainder.

## CONCLUSION

For the foregoing reasons, the Court DENIES the petitioner's motion for summary judgment.

A separate Order consistent with this Memorandum Opinion shall issue this date.

Signed by Royce C. Lamberth, United States District Judge, on March 21, 2014.

12