# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————— x
:
TOFIQ NASSER AWAD AL BIHANI (ISN 893),   :   Case Nos.
:
ABDU LATIF NASSER (ISN 244),   :   04-cv-1194 (TFH) (ISN 569)
:
SHARQAWI AL HAJJ (ISN 1457),   :   05-cv-23 (UNA) (ISN 841)
:
SANAD AL KAZIMI (ISN 1453),   :   05-cv-764 (CKK) (ISN 244)
:
SUHAIL SHARABI (ISN 569),   :   05-cv-1607 (RCL) (ISNs 1460, 1461)
:
SAID NASHIR (ISN 841),   :   05-cv-2386 (RBW) (ISNs 893, 1453)
:
ABDUL RABBANI (ISN 1460),   :   08-cv-1360 (EGS) (ISN 10016)
:
AHMED RABBANI (ISN 1461),   :   08-cv-1440 (CKK) (ISN 10025)
:
ABDUL RAZAK (ISN 685),   :   09-cv-745 (RCL) (ISN 1457)
:
ABDUL MALIK (ISN 10025),   :   10-cv-1020 (RJL) (ISN 685)
:
ABU ZUBAYDAH (ISN 10016),   :
:
                    Petitioners,   :
:
                    v.   :
:
DONALD J. TRUMP, *et al.*,   :
:
                    Respondents.   :
:
———————————————————— x


## MOTION FOR ORDER GRANTING WRIT OF HABEAS CORPUS

Petitioners, by and through their undersigned counsel, respectfully move for an order

granting the writ of habeas corpus.

## INTRODUCTION

Petitioners are 11 Muslim men[1] who have all been detained at Guantánamo without

charge or trial, many of them for nearly 15 years or more.  Their detention has spanned three

presidential administrations and as many as five presidential terms.  Many are suffering the

devastating psychological and physiological consequences of indefinite detention in a remote

prison camp where they have endured conditions devised to break human beings, and where the

aura of forever hangs heavier than ever.  Given President Donald Trump's proclamation against

releasing any petitioners – driven by executive hubris and raw animus rather than by reason or

deliberative national security concerns – these petitioners may never leave Guantánamo alive,

absent judicial intervention.

Petitioners have participated in habeas corpus litigation that this Court and the higher

courts have entertained for years, but this motion, brought by detainees collectively, is different –

as it has to be.  The two prior presidential administrations released a total of nearly 750 men.

They did so by making case-by-case determinations based on an individual detainee's

circumstances in a manner that was purportedly tailored to the executive branch's interest in

national security.  President Trump, in contrast to his predecessors, has declared and is carrying

out his intention to keep all remaining detainees in Guantánamo, regardless of their individual

circumstances – presumably even those the executive branch previously determined need no

longer be detained.  This defiant policy exceeds his authority under the 2001 Authorization for

---

[1] Tofiq Nasser Awad Al Bihani (ISN 893), Sharqawi Al Hajj (ISN 1457), Sanad Al Kazimi (ISN 1453), Suhail Sharabi (ISN 569), Said Nashir (ISN 841), Abdul Rabbani (ISN 1460), Ahmed Rabbani (ISN 1461), Abdu Latif Nasser (ISN 244), Abdul Razak (ISN 685), Abdul Malik (ISN 10025); Abu Zubaydah (ISN 10016).

Use of Military Force ("AUMF"), which permits detention only for the narrow purpose of preventing the return of detainees to the battlefield.  Instead, the policy is a symbolic, undifferentiated assertion of this President's expectation of absolute executive authority and a rejection of the policy framework that has governed Guantánamo detentions for years.  Not least, it is a demonstration of his antipathy toward this prisoner population, all foreign-born Muslim men, and toward Muslims more broadly, of the kind courts have properly rejected in recent months.  *See, e.g., Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017); *Hawaii v. Trump*, 859 F.3d 741 (9th Cir. 2017); *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554 (4th Cir. 2017).

For these 11 habeas petitioners, Guantánamo now sits in an even more precarious and dubious legal space than it did in 2002, when the executive branch resisted any legal constraints on its detention authority – a position the courts ultimately rejected in favor of judicial intervention.  *See Rasul v. Bush*, 542 U.S. 466 (2004).  Petitioners have all been detained between *ten and sixteen* years without charge or trial, and for much of that time, in subhuman conditions.  Given the President's commitment, in fulfillment of a campaign promise, not to release any detainees during his administration, they face an arbitrary additional term of detention of four, or possibly eight, years.  Such an additional term of years will mean irreparable harm for Petitioners.  For the aging and unwell among them, including some on prolonged hunger strike, it may not be survivable.  Habeas is a flexible, equitable remedy that at its core is meant to check arbitrary executive action.  When fundamental legal principles – and human lives – are at stake, the judicial branch is compelled to act.

First, the Due Process Clause of the Constitution applies to limit the executive's detention authority over Petitioners, for the same reasons the Supreme Court and the D.C. Circuit Court of

Appeals have respectively concluded that the Suspension Clause and the Ex Post Facto Clause of the Constitution apply to limit such authority in Guantánamo.  The Supreme Court has consistently held that the Due Process Clause places substantive limits on noncriminal detention, regardless of the facts or procedures that may have justified an initial detention decision years earlier.  That includes a prohibition on perpetual detention disconnected from any legitimate purpose; and group detention of an additional four or eight years based on executive fiat and animus is the type of arbitrary executive action due process is designed to check.  Continuing detention is particularly arbitrary for those Petitioners whom the executive branch has already cleared for transfer – and thus where detention is *concededly* without a bona fide purpose.  Due process also requires carefully tailored procedures for detention of this sort.  Because perpetual detention carries a severe and increasing risk of erroneous deprivation of liberty, it must be based on more proof than a mere preponderance of the evidence.

Second, the AUMF – the statutory basis upon which a plurality in *Hamdi v. Rumsfeld*, 542 U.S. 567 (2004), held may authorize limited military detention – can no longer support the detention of Petitioners.  Whatever authorization for detention may have existed in 2004, for the limited law-of-war purpose of preventing Mr. Hamdi's return to the battlefield in which he was allegedly captured three years prior, *Hamdi* did not authorize perpetual detention, disconnected from any legitimate purpose, of the kind Petitioners now endure.  In addition, as predicted by the plurality in *Hamdi*, the traditional law-of-war understanding that may have justified detention in 2004 has "unraveled," as the "practical circumstances" of the conflict with Al Qaeda have long ceased to resemble any of the conflicts that informed the development of the law of war.  The battlefield at issue in *Hamdi*, which was active in the months after 9/11, is today no more than an amorphous, interminable morass, global in scope, that could justify Petitioners' lifetime

imprisonment if left unchecked.  The *Hamdi* Court acknowledged that the prospect of perpetual detention would indeed be a troubling one, but left the legality of it for another day; that day is today.

As the Court in *Boumediene v. Bush*, 533 U.S. 723 (2008), recognized, habeas developed to prevent arbitrary executive imprisonment and was constitutionally guaranteed by the Suspension Clause to prevent cyclical abuses of executive power.  The President's apparent policy to detain for detention's sake, driven by religious animus, is unlawful.  The obligation of the habeas court is clear.  Because Petitioners' detentions violate the Constitution and the AUMF, their habeas petitions should be granted.  And, should the President wish to detain Petitioners, the Constitution offers him one valid process to do so.  The "Executive may . . . hand him over to the criminal authorities, whose detention for the purpose of prosecution will be lawful, or else must release him."  *Hamdi*, 542 U.S. at 576 (Scalia, J., dissenting).

## FACTUAL BACKGROUND

### A.    Guantánamo's Beginnings

On September 18, 2001, Congress passed the Authorization for Use of Military Force, Pub. L. No. 107-40, § 2(a), 115 Stat. 224, 224 (2001) ("AUMF").  The statute authorized the executive branch – then led by President George W. Bush – to "use all necessary and appropriate force" against those individuals or groups responsible for the September 11, 2001 attacks. Roughly one month later, the United States invaded Afghanistan as part of Operation Enduring Freedom – an operation that was concluded in December 2014.[2]  As part of its military efforts, U.S. forces detained hundreds of men and boys on suspicion of being hostile fighters, often by

---

[2] *Operation Enduring Freedom Fast Facts*, CNN (Oct. 5, 2016), http://cnn.it/2m8lD37.

paying sizable bounties to local residents and authorities.[3]  Guantánamo was selected as a detention site because administration officials wrongly concluded that U.S. federal courts were unlikely to exercise jurisdiction over non-citizen detainees held extraterritorially.[4]  Guantánamo represented a "legal black hole" – a necessary precondition for a regime of indefinite detention where suspects were to be coercively interrogated and were in fact subjected to an inhumane system devised to break their will.[5]

Legal challenges immediately followed Guantánamo's opening.  In *Rasul*, the Supreme Court rejected the administration's assertion of unreviewable authority to declare Guantánamo prisoners "enemy combatants," and confirmed that detainees possessed a statutory right to challenge the legality of their detention through habeas corpus.  At the same time, the Court decided *Hamdi*, where a plurality ruled that the AUMF, consistent with "longstanding law-of-war principles," authorized the detention of individuals apprehended on the battlefield in Afghanistan in order to prevent their return to that battlefield (but not indefinitely for purposes of interrogation), subject to elementary due process protections such as notice, counsel and an opportunity to be heard.  The Court also cautioned that if the "practical circumstances"

---

[3] *Guantánamo Inmates Say They Were 'Sold*,*'* Assoc. Press (May 31, 2005), http://nbcnews.to/2CIOvZS.

[4] *See* Memorandum for William J. Haynes, II, General Counsel, Department of Defense, Guantánamo from Patrick F. Philbin, Deputy Assistant Attorney General and John C. Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Possible Habeas Jurisdiction over Aliens Held in Guantánamo Bay, Cuba* (Dec. 28, 2001).

[5] *See* Joseph Margulies, Guantánamo and the Abuse of Presidential Power 11, 45 (2006); Neil A. Lewis, *Red Cross Finds Detainee Abuse in Guantánamo*, N.Y. Times (Nov. 30, 2004), http://nyti.ms/2Ee1OxZ; Andrew Kent, *Disappearing Legal Black Holes and Converging Domains: Changing Individual Rights Protection in National Security and Foreign Affairs*, 115 Colum. L. Rev. 1029, 1030, 1034, n.23 (2015).

surrounding the law-of-war detention fundamentally changed, the authority to detain may "unravel." *Hamdi*, 542 U.S. at 521.

Congress sought to undo *Rasul* several times – first in passing the Detainee Treatment Act, and then (when the Supreme Court's decision in *Hamdan v. Rumsfeld,* 548 U.S. 557 (2006), invalidated the DTA's attempt at habeas stripping)) in the Military Commission Act of 2006. The Supreme Court responded in *Boumediene*, by ruling that Guantánamo detainees have the constitutional right to access habeas relief that cannot be abrogated by the political branches, which must include a "meaningful opportunity" to challenge the legal and factual basis of detention. The Court left it to the "expertise and competence" of the district courts to govern habeas proceedings. *Boumediene*, 553 U.S at 796.

### B.       The Obama and Bush Administrations' Efforts to Close Guantánamo

Following *Boumediene*, many Guantánamo detainees successfully pursued habeas challenges.[6] This resulted in several court-ordered releases.[7] The drawdown of the prison population, however, had been underway for some time. Throughout his tenure, President Bush routinely released prisoners by concluding discretionary bilateral agreements with foreign governments seeking the return of their detainee-citizens in a manner the administration asserted was consistent with U.S. national security interests. Hundreds of prisoners were released in this

---

[6] Guantánamo detainees won roughly 60% of the first 34 post-*Boumediene* challenges at the trial level. *See* Mark Denbeaux et al., *No Hearing Habeas: D.C. Circuit Restricts Meaningful Review*, May 1, 2012, Seton Hall Public Law Research Paper No. 2145554, available at SSRN: http://dx.doi.org/10.2139/ssrn.2145554.

[7] William Glaberson, *Judge Orders 17 Detainees at Guantánamo Freed*, N.Y. Times (Oct. 7, 2008), http://nyti.ms/2CyhBqT.

way between 2002 and 2008, sometimes en masse,[8] even while the scope of habeas rights at Guantánamo was yet unresolved in federal court.

All told, President Bush released 532 of the 780 prisoners sent to Guantánamo.[9]  This is consistent with his assessment that "it should be a goal of the [United States] to shut down Guantánamo."[10]  President Bush would later state that Guantánamo had become a "propaganda tool for our enemies and a distraction for our allies."[11]  That conclusion reflected an emerging political consensus about Guantánamo.[12]

President Obama continued the policy of reviewing and releasing detainees, formalizing it to a greater extent than his predecessor.  After mandating the closure of the prison in one year,[13] he established the Guantánamo Review Task Force, comprised of six national security and law enforcement agencies, charged with reviewing and determining by unanimous consensus

---

[8] *See* Carol Rosenberg, *In largest Obama Era Transfer, Guantánamo Sends 10 Cleared Captives to Oman*, Miami Herald (Jan. 14, 2016) (explaining that "big transfers" including double digit transfers were common during President Bush's tenure), http://hrld.us/1SPYXPe.

[9] *See The Guantánamo Docket, Interactive Timeline*, N.Y. Times, http://nyti.ms/2CA9Sso.

[10] Remarks of President George W. Bush, News Conference, Aug. 9, 2007, http://bit.ly/2COkVl9.

[11] George W. Bush, Decision Points (2001).

[12] For example, during the 2008 presidential campaign, Senator John McCain favored closing Guantánamo because he saw it as "symbol" of U.S. torture that serves as a recruiting tool for terrorists. Senator John McCain, Conversation with Walter Isaacson, The Aspen Institute (Aug. 14, 2008), http://www.youtube.com/watch?v=Rp7YdDXo2Rc; *see also* Report, Senate Armed Services Committee, Inquiry into the Treatment of Detainees in U.S. Custody (Nov. 20, 2008), http://bit.ly/2m6Ub5L. His opponent, then-Senator Barack Obama, agreed.  In a speech at the National Archives in May 2009, President Obama explained "instead of serving as a tool to counter terrorism, Guantánamo became a symbol that helped al Qaeda recruit terrorists to its cause."  Remarks by the President on National Security, National Archives, Washington, D.C. (May 21, 2009), http://bit.ly/2lZqPFA.

[13] *See* Exec. Order No. 13,492, 74 Fed. Reg. 4897 (Jan. 22, 2009).

the suitability of each detainee for release.  President Obama also appointed special envoys from

the U.S. Departments of State and Defense to negotiate and facilitate detainee transfers.  The

Task Force completed its work in 2010.  Of the 242 prisoners remaining at Guantánamo when

President Obama took office, more than half were approved for transfer.  Forty-eight others were

designated for continuing detention under the AUMF, but would receive further periodic

reviews.[14]  During the first two years of the Obama administration, about 70 detainees were

transferred from Guantánamo and repatriated or resettled.[15]

At the same time, the avenues to win court-ordered releases were narrowing.  In January

2010, the D.C. Circuit issued its first post-*Boumediene* Guantánamo decision in *Al-Bihani v.

Obama*, 590 F.3d 866 (D.C. Cir. 2010), which upheld the petitioner's detention on thin evidence

of a highly attenuated connection to the Taliban.  Other decisions soon followed that filled in the

procedural architecture of *Boumediene* in ways that granted the government expansive detention

authority at Guantánamo.  *See, e.g.*, *Al Odah v. United States*, 611 F.3d 8 (D.C. Cir. 2010)

(holding that hearsay evidence is always admissible against detainees); *Al Adahi v. Obama*, 613

F.3d 1102 (D.C. Cir. 2010) (empowering appeals court to displace trial court's judgments

concerning credibility of witnesses and evidence); *Latif v. Obama*, 666 F.3d 746 (D.C. Cir. 2011)

(according government evidence a presumption of accuracy).[16]

---

[14] Final Report of the Guantánamo Review Task Force 7 (Jan. 22, 2010), http://bit.ly/2CzdwTq.

[15] Michelle Shephard, *Gitmo's Fallen Czar*, Foreign Policy (May 23, 2013),
http://bit.ly/2CAa2Qw.

[16] Further complicating prisoner releases, the National Defense Authorization Act (NDAA) for
2011 and subsequent iterations have included restrictions on Guantánamo detainee transfers.
Between January 2011, when the NDAA restrictions went into effect, and the end of 2013, there
were only six prisoner transfers, including a stretch of over 14 months without a single release –
the longest such period since the prison opened.

President Obama, however, continued to reaffirm his commitment to closing the prison.[17]
After pronounced delays, his administration commenced the Periodic Review Boards (PRB) in
2013 – the administrative process for determining whether prisoners previously slated for
continuing detention could be cleared for release.  Of the 64 detainees reviewed by the PRB by
the end of the Obama administration, 38 were approved for transfer.  Thirty-six of those men
were eventually released between 2014 and the end of the administration.  In total, President
Obama transferred 197 prisoners from Guantánamo.  Still, 41 remain today, including five men
cleared for release.

Petitioners are 11 of the remaining 41 men imprisoned at Guantánamo, all foreign-born
Muslims hailing from Yemen, Pakistan, Morocco, Algeria, Kenya, Saudi Arabia, and Palestine.
Two have been cleared for release and nine have been designated for continuing law-of-war
detention.  None have been charged.  All have been held for between ten and sixteen years and
have no prospect of release.

### C.    Impact of Indefinite Detention on the Petitioners

Guantánamo is now in its sixteenth year of operation.  Some Petitioners have been
imprisoned there the entirety of that time: through four presidential terms (now having entered a
fifth), eight sessions of Congress, and a constantly shifting conflict with Al Qaeda that years ago
became the longest war in U.S. history.[18]  Throughout, Petitioners have endured perpetual
uncertainty about their fate, including whether they will ever be released, resulting in severe and

---

[17] *See* Remarks by the President at the National Defense University, Fort McNair Washington,
D.C. (May 23, 2013), http://bit.ly/2l0AXBh.

[18] Bill Bradley, *America's War in Afghanistan Is Now Officially Longer Than Vietnam*, Vanity
Fair (Jun. 7, 2010), http://bit.ly/2masf15.

degenerative physical and psychological effects.[19]  Medical experts liken prolonged indefinite

detention to sensory deprivation – a recognized form of psychological torture.[20]  These effects

are, of course, layered on top of the systemic abuse – indeed, an intentional system of cruel

treatment and torture, as the International Committee of the Red Cross once described it – that

Petitioners suffered for years at Guantánamo.[21]

Nine detainees have died since the prison opened,[22] several possibly by suicide.[23]

Prisoners are medicated for depression and anxiety brought on by acute despair.[24]  Hunger

strikes began almost immediately after the prison opened and persist today.[25]  Some detainees

have starved themselves nearly to the point of death to protest against their open-ended

imprisonment at Guantánamo.  *See Ba Odah v. Obama*, 06-cv-1668 (TFH) (D.D.C.).[26]  This is to

say nothing of the toll taken by the passage of time.  In August 2017, Guantánamo's eldest

---

[19] *See* Joint Letter from Bellevue/NYU Program for Survivors of Torture, the Center for Victims of Torture, and Physicians for Human Rights to U.S. Senate on Indefinite Detention (Jun. 6, 2016), http://bit.ly/2CPTZCw.

[20] Cheyette, Cara, *Punishment Before Justice: Indefinite Detention in the U.S.*, Physicians for Human Rights, p.11 (June 2011), http://bit.ly/2qzmTkl.

[21] *See* Neil A. Lewis, *Red Cross Finds Detainee Abuse in Guantánamo*, N.Y. Times (Nov. 30, 2004), http://nyti.ms/2Ee1OxZ; Neil A. Lewis & Eric Schmitt, *Inquiry Finds Abuses at Guantánamo Bay*, N.Y. Times (May 1, 2005), http://nyti.ms/2CYyEDr.

[22] *Guantánamo by the Numbers*, Miami Herald (Oct. 25, 2016), http://hrld.us/1wrTi6n.

[23] James Risen & Tim Golden, *3 Prisoners Commit Suicide at Guantánamo*, N.Y. Times (Jun. 11, 2006), http://nyti.ms/2CKqLUK.

[24] Sheri Fink, *When Even Nightmares Are Classified: Psychiatric Care at Guantánamo*, N.Y. Times (Nov. 12, 2016), http://nyti.ms/2m3zEhL.

[25] Charlie Savage, *Military Is Waiting Longer Before Force-Feeding Hunger Strikers, Detainees Say*, N.Y. Times (Oct. 11, 2017), http://nyti.ms/2gcDS7D.

[26] Editorial, *The Pentagon's Insubordination on Guantánamo*, N.Y. Times (Jan. 2, 2016), http://nyti.ms/2CPUble.

prisoner turned 70 years of age.  He reportedly suffers from diabetes, high blood pressure, and arthritis.[27]  Chronic illnesses of this sort are commonplace amongst Guantánamo's aging prison population.  *See Al Hajj v. Trump*, 09-cv-745 (RCL) (D.D.C.).  The Department of Defense has obtained medical equipment in anticipation of the inevitable further decline of elderly prisoners whom the United States will not transfer – even temporarily – for potentially life-saving care.[28]

The final remaining prisoners now linger in an expansive facility, occupying cell blocks that are sparsely populated.  Some report that this increases the psychological stress of their indefinite detention.  Their experience now is of being stranded.  This includes Petitioners Tofiq Nasser Awad Al Bihani and Abdul Latif Nasser.  Both missed their chances at freedom by the slimmest of margins and thinnest of reasons.  Indeed both were so close that during the final stages of the Obama presidency, prison officials put them through exit protocols in anticipation of their transfer flights.  The transfers would not occur, however, and both were returned to their cells and now, arbitrarily, have no prospect of release.[29]

### D.      President Trump's Refusal to Release Petitioners During His Presidency

President Trump has defiantly reversed course from the individualized determinations and transfer efforts of his predecessors' administrations, tailored as they purported to be, to considered national security determinations.  He has done so in favor of an undifferentiated diktat that evidences both executive hubris and religious animus.  As a result, he ensures that the

---

[27] Carol Rosenberg, *Happy Birthday? Pakistani Captive at Guantánamo Turns 70, Plans to Write Old Neighbor President Trump*, Miami Herald (Aug. 17, 2017), http://hrld.us/2D0kyBJ.

[28] Carol Rosenberg, *For Aging Guantánamo Captives, A Cardiac Care Lab*, Miami Herald (Sept. 28, 2012), http://hrld.us/2m8JPCk.

[29] Missy Ryan & Julie Tate, *Trump Era Strands These Five Men at Guantánamo  Bay*, Wash. Post (Jan. 22, 2017), http://wapo.st/2D2MDIr.

remaining detainee population, regardless of conduct, circumstance or status, will remain imprisoned at Guantánamo for at least four to eight more years.

To be clear, President Trump's actions and statements mark a radical change of position by the government.  The President has *explicitly* endorsed indefinite detention rather than a detention "informed by the laws of war," which was the position of his predecessors.  And the President has done so without regard to the length of the conflict in Afghanistan or the parties to such hostilities.  Indeed, to avoid a clear violation of applicable international law addressed *infra*, the previous administrations claimed that their detention authority extended only "for the duration of hostilities" in Afghanistan.  *See*, *e.g.*, *Abdullah v. Obama*, 753 F.3d 193, 198-99 (D.C. Cir. 2014).  Now the violation of international law is manifest with President Trump's avowed determination to detain Petitioners for reasons wholly unrelated to any actual ostensible need for their continued detention.

During his campaign, President Trump pledged to keep Guantánamo open and "load it up with some bad dudes," and said he would "absolutely authorize" torture techniques like waterboarding against terrorist suspects, "who deserve it anyway."[30]  He has advocated for American citizens to be tried by Guantánamo military commissions in direct contravention of federal law[31] – and more recently called for a Muslim man who killed several people in New York to be sent to Guantánamo and denied constitutional process, though he has never suggested

---

[30] *See* David Welna, *Trump Has Vowed to Fill Guantánamo With Bad Dudes—But Who?*, NPR (Nov. 14, 2016), http://n.pr/2CNr01T; *see also* Remarks of Donald Trump, Sparks, NV (Feb. 23, 2016), https://www.youtube.com/watch?v=vI3ChCda2gg; Jenna Johnson, *Trump says 'torture works,' backs waterboarding and 'much worse,'* Wash. Post (Feb. 17, 2016), http://wapo.st/2CMa5fr.

[31] Patricia Mazzei, *Trump: Americans Could be Tried in Guantánamo*, Miami Herald (Aug. 11, 2016), http://hrld.us/2b0v2lN.

that white male mass killers should ever be denied due process.[32]   Shortly before his

inauguration, he expanded on his position on Guantánamo, bluntly declaring via Twitter in

response to the Obama administration's transfer of detainees cleared for release that "there

should be no further releases from Guantánamo," profiling even men every relevant agency had

unanimously determined were not a threat as "extremely dangerous people."[33]   He effectively

endorsed President Roosevelt's internment of Japanese Americans during World War II and

answered that his seemingly favorable position on internment camps is defensible because

Roosevelt "did the same thing."[34]   He has repeatedly defined his presidency in reflexive

opposition to actions of his predecessors, especially President Obama.[35]   That position has held

true for the first full year of his presidency.

 This proclamation to not release detainees must be seen in connection with his regularly

expressed, undifferentiated suspicion of, and antipathy toward, Muslims.  To take a small

sample, Trump has called for "a total and complete shutdown of Muslims" entering the

country;[36] argued that all Muslims suffer from a "sickness . . . there's a sickness going on";[37] has

---

[32] Ali Vitali & Jane C. Timm, *Trump: Consider Sending NYC Truck Attacker to Guantánamo Bay*, NBC (Nov. 2, 2017), http://nbcnews.to/2A6uac8.

[33] Donald J. Trump, Twitter (Jan. 3, 2017), https://twitter.com/realDonaldTrump/status/816333480409833472.

[34] Miriam Hernandez, *Trump Cites History to Defend Muslim Immigration Ban*, ABC 7 (Dec. 9, 2015).

[35] Peter Baker, *Can Trump Destroy Obama's Legacy?*, N.Y. Times (Jun. 23, 2017), http://nyti.ms/2tF0Jef.

[36] Press Release, Trump-Pence, *Donald J. Trump Statement on Preventing Muslim Immigration* (Dec. 7, 2015), http://bit.ly/2qkaDmL.

[37] Dan Friedman, *Trump Cites "Sickness" in Defense of Muslim Immigration Ban Proposal*, Fox News (Dec. 13, 2015), http://fxn.ws/2m7BnDh.

characterized his view of the Constitution's commitment to religious equality "differently" as it might lead us to "commit[] suicide";[38] and considered Islam a religion that categorically "hates us."[39]   He has repeatedly called for registering Muslims in the United States,[40] stated that the U.S. has "no choice" but to engage in profiling of Muslims and shut down mosques,[41] and boasted that he alone could understand how indiscriminately dangerous all Muslims are when he tweeted in 2016, "it is amazing how often I am right" about Muslims.[42]   Circulating a false story about General John Pershing, Trump twice suggested that Muslim terrorist suspects should be shot by bullets dipped in pig's blood.[43]   In December, he retweeted with approbation vile, inflammatory videos by a neo-Nazi/ultranationalist British group that paints Islam as a fundamentally demonic religion.[44]

---

[38] Interview of Donald Trump, NBC News (July 24, 2016), available at http://nbcnews.to/2F7s3Hy.

[39] Theodore Schleifer, *Donald Trump: 'I think Islam hates us'*, CNN (Mar. 10, 2016), http://cnn.it/1RBk6Z4.

[40] *See, e.g.,* Vaughn Hillyard, *Donald Trump's Plan for a Muslim Database Draws Comparison to Nazi Germany,* NBC News (Nov. 20, 2015), http://nbcnews.to/1NGfWNs; Lauren Carroll, *In Context: Donald Trump's comments on a database of American Muslims,* Politifact (Nov. 24, 2015), http://bit.ly/1MPx8QY; Hunter Walker, *Donald Trump has big plans for 'radical Islamic' terrorists, 2016 and 'that communist' Bernie Sanders,* Yahoo News (Nov. 19, 2015), https://yhoo.it/2Czc6IE.

[41] Nick Gass, *Trump: 'Absolutely no choice' but to close mosques,* Politico (Nov. 18, 2015), http://politi.co/1Yh0O0s; *Trump says US will 'have no choice' but to shut some mosques down*, Fox News (Nov. 18, 2015), http://fxn.ws/2m28zvf.

[42] Donald J. Trump, Twitter (Mar. 24, 2016), https://twitter.com/realDonaldTrump/status/713012045214531584.

[43] David Nakamura*, Trump recycles discredited Islamic pigs' blood tale after terrorist attack in Barcelona*, Wash. Post (Aug. 17, 2017), http://wapo.st/2F5N4Cv.

[44] Peter Baker & Eileen Sullivan, *Trump Shares Inflammatory Anti-Muslim Videos and Britain's Leader Condemns Them*, N.Y. Times (Nov. 29, 2017), http://nyti.ms/2hZqHEn.  In addition, many senior members of President Trump's cabinet have similarly expressed blanket hostility to

The President's opposition to prisoner releases from Guantánamo tracks other indiscriminate policy initiatives of his – which have been struck down by the courts – including the iterative bans on travel to the United States from certain majority-Muslim countries[45] and the ban on transgendered Americans serving in the armed forces.[46]  His stance on Guantánamo calls for no less searching judicial scrutiny.

## ARGUMENT

## I.   PETITIONERS' CONTINUING, PERPETUAL AND ARBITRARY DETENTION VIOLATES DUE PROCESS.

The Due Process Clause of the Constitution applies at Guantánamo and places substantive limitations on executive detention of the kind at issue here, including a durational limitation that compels relief regardless of the original bases for the detention.  Petitioners, many of whom have been in detention for nearly 15 years or more without charge (either by military commission or an Article III court process), have reached the outer limits of that durational limit, particularly where the executive branch has apparently determined that no one – regardless of circumstance and independent of any legal rationale – will be transferred from Guantánamo. Perpetual detention on the basis of no more than executive decree is an arbitrary restraint on

the idea of releasing Guantánamo prisoners.  CIA Director Mike Pompeo (who has been rumored to take over the Department of State, *see* Abigail Tracy, "*It's All but a Done Deal": Insiders Expect CIA Director Mike Pompeo to Take over the State Department*, Vanity Fair (Nov. 30, 2017), http://bit.ly/2i5fItl)) as well as White House Chief of Staff John Kelly reportedly sought to obstruct past prisoner transfers themselves.  *See* Mike Pompeo, *Guantánamo Detainees Don't Belong in Anyone's Backyard*, Kansas City Star (Sept. 6, 2015), http://bit.ly/2CMV9yq; Charles Levinson & David Rohde, *Special Report: Pentagon Thwarts Obama's Effort to Close Guantánamo*, Reuters (Dec. 29, 2015), http://reut.rs/1PufaGY.

[45] *Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017) (TRO against Executive Order 13769 ("EO-1")); *Hawaii v. Trump*, 859 F.3d 741 (9th Cir. 2017) (TRO against Executive Order 13780, revising EO-1); *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554 (4th Cir. 2017) (same).

[46] *Doe v. Trump*, No. 17-cv-1597 (CKK) (D.D.C. Oct. 30, 2017) (TRO against transgender military ban).

liberty that must be remediated by the judicial branch. *See Hamdi*, 542 U.S. at 529 (freedom from bodily restraint is the "most elemental of liberty interests" and has "always been at the core of liberty protected by the Due Process Clause from arbitrary governmental action") (quoting *Foucha v. Louisiana*, 501 U.S. 71, 80 (1992)). Similarly, detention of this length cannot continue, consistent with due process, based only on a preponderance of the evidence that an individual was many years earlier a member of or associated with a detainable group. The risk of ongoing, erroneous detention based on such thin procedural protections likewise compels relief.

### A.      The Due Process Clause Applies at Guantánamo

In *Boumediene*, the Supreme Court held that the Suspension Clause of the Constitution protects the right of detainees held at Guantánamo to challenge the legality of their detention. In reaching this conclusion, the Court explained that it was merely reaffirming its long-standing jurisprudence to determine what constitutional standards apply when the government acts with respect to non-citizens outside the territorial boundaries of the United States. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 277 (1990) (Kennedy, J., concurring) ("The proposition is, of course, not that the Constitution 'does not apply' overseas but that there are provisions in the Constitution which do not necessarily apply in all circumstances in every foreign place.") (quoting *Reid v. Covert*, 354 U.S. 1, 74 (1957) (Harlan, J., concurring)).

Specifically, in *Boumediene*, the Court applied a functional test in determining that the Suspension Clause restrains the Executive's conduct as to Guantánamo detainees, and concluded that it would not be "impractical and anomalous" to grant detainees habeas review because "there are few practical barriers to the running of the writ" at Guantánamo. *See* 553 U.S. at 769-71; *id.* at 784-85 (addressing due process). The Court reasoned that "Guantánamo Bay . . . is no

16

transient possession.  In every practical sense Guantánamo is not abroad; it is within the constant

jurisdiction of the United States." *Id.* at 768-69; *see also Rasul*, 542 U.S. at 487 (Kennedy, J.,

concurring) ("Guantánamo Bay is in every practical respect a United States territory" where our

"unchallenged and indefinite control . . . has produced a place that belongs to the United States,

extending the 'implied protection' of the United States to it.").

      After *Boumediene*, it inescapably follows that the Due Process Clause also applies – as

much as the Suspension Clause – at Guantánamo to constrain certain executive branch actions.

This is particularly true as concepts animating due process and habeas corpus are intertwined.

*See Hamdi*, 542 U.S. at 525-26 (discussing interaction of habeas and due process); *id.* at 555-57

(Scalia, J., dissenting) (same).  The *Boumediene* Court's functional analysis led to recognition of

the applicability of the Suspension Clause in Guantánamo.  Therefore, at least some measure of

the Due Process Clause must also reach Guantánamo because there are no practical barriers that

would apply to one provision but not the other.  *See Hamdi*, 542 U.S. at 538 ("[A] court that

receives a petition for a writ of habeas corpus from an alleged enemy combatant must itself

ensure that the minimum requirements of due process are achieved."); *Boumediene,* 553 U.S. at

784-85 (addressing due process).  *Cf. Hussain v. Obama*, 134 S. Ct. 1621 (2014) (statement of

Justice Breyer respecting denial of certiorari).  Just as there are no practical or structural barriers

that make it impractical or anomalous to adjudicate the factual or legal justification for detention

under the Suspension Clause, there are no such barriers to preclude adjudication of the question

of durational limits to detention under the Due Process Clause, or the other substantive and

procedural requirements that would protect against arbitrary detention.  *See Verdugo-Urquidez*,

494 U.S. at 278 (Kennedy, J., concurring) ("All would agree, for instance, that the dictates of the

Due Process Clause of the Fifth Amendment protect the defendant.").

The D.C. Circuit's decision in *Kiyemba v. Obama*, 555 F.3d 1022 (D.C. Cir. 2009) (*Kiyemba I*), does not preclude the application of due process at Guantánamo.  That decision addressed only the narrow question of whether due process authorizes entry and release into the United States of non-citizens without property or presence in the country – a particular context in which the executive's authority to regulate immigration is maximal.  *Id.* at 1026-27.  Indeed, this limited reading of *Kiyemba I* is the only one consistent with *Boumediene* or even subsequent panel decisions of the D.C. Circuit.  *See Kiyemba v. Obama*, 561 F.3d 509, 514 n.4 (D.C. Cir. 2009) (*Kiyemba II*) ("[W]e assume arguendo these alien detainees have the same constitutional rights . . . as . . . U.S. citizens" detained by the U.S. military in Iraq); *id.* at 518 n.4 (Kavanaugh, J., concurring) ("[A]s explained in the opinion of the Court and in this concurring opinion, the detainees do not prevail in this case even if they are right about the governing legal framework: Even assuming that the Guantánamo detainees . . . possess constitutionally based due process rights" they would not prevail); *Kiyemba v. Obama*, 605 F.3d 1046, 1048 (D.C. Cir. 2010) (*Kiyemba III*) ("[P]etitioners never had a constitutional right to be brought to this country and released."); *id.* at 1051 (Rogers, J., concurring) ("Whatever role due process and the Geneva Conventions might play with regard to granting the writ, petitioners cite no authority that due process or the Geneva Conventions confer a right of release in the continental United States."). *Cf. Aamer v. Obama*, 742 F.3d 1023, 1039 (D.C. Cir. 2014) ("As the government does not press the issue, we shall, for purposes of this case, assume without deciding that the constitutional right to be free from unwanted medical treatment extends to nonresident aliens detained at Guantánamo.").

Unsurprisingly, therefore, the government has conceded, and subsequent decisions of the D.C. Circuit have assumed, that the Ex Post Facto Clause of the Constitution, U.S. Const. art. I, §

9, cl. 3, applies at Guantánamo in light of *Boumediene* and notwithstanding *Kiyemba I.  See Al Bahlul v. United States*, 767 F.3d 1, 18 (D.C. Cir. 2014) (en banc) (noting that government concedes Ex Post Facto Clause applies at Guantánamo); *id.* at 49 (Rogers, J., concurring) ("[*Boumediene*'s] analysis of the extraterritorial reach of the Suspension Clause applies to the Ex Post Facto Clause because the detainees' status and location at Guantánamo Bay are the same, and the government has pointed to no distinguishing 'practical obstacles' to its application."); *id.* at 65 n.3 (Kavanaugh, J., dissenting) ("As the Government concedes, the *Boumediene* analysis leads inexorably to the conclusion that the ex post facto right applies at Guantánamo.").  As Judge Kavanaugh explained, "[d]etermining whether the Constitution applies to non-U.S. citizens in U.S. territories requires a 'functional' rather than 'formalistic' analysis of the particular constitutional provision and the particular territory at issue. . . . In *Boumediene*, the Court determined that Guantánamo was a *de facto* U.S. territory—akin to Puerto Rico, for example, and not foreign territory."  *Id.* (distinguishing *Johnson v. Eisentrager*, 339 U.S. 763, 777-81 (1950)); *see also Torres v. Puerto Rico*, 442 U.S. 465, 469 (1979) (Due Process Clause applies in Puerto Rico); *Haitian Ctrs. Council v. McNary*, 969 F.2d 1326, 1343 (2d Cir. 1992) (application of Fifth Amendment at Guantánamo would not be impractical or anomalous), *vacated as moot*, *Sale v. Haitian Ctrs. Council*, 509 U.S. 918 (1993).[47]

Accordingly, whatever the case may be with respect to due process rights to *enter* the United States for release addressed in the *Kiyemba* cases, it is plain that some measure of due process extends to executive actions undertaken in Guantánamo.

---

[47] The D.C. Circuit's decisions in *Rasul v. Myers*, 563 F.3d 527 (D.C. Cir. 2009), and *Al Madhwani v. Obama,* 642 F.3d 1071 (D.C. Cir. 2011), are not to the contrary.  Those decisions specifically avoided due process claims brought by current and former detainees.

### B.     Petitioners' Continuing Detention Violates Due Process

Petitioners' continuing detention violates their fundamental due process rights in at least

three respects.  First, detention without charge or trial of this length, which is still without

foreseeable end and potentially permanent, violates the Due Process Clause's durational limits

on detention; under President Trump's animus-driven decree to prevent the release of any

detainee regardless of individual circumstance or *bona fide* security assessments renders such

prolonged detention arbitrary and unlawfully punitive.

Second, indefinite detention of this nature can no longer be justified under Supreme

Court precedent when it was based upon a mere preponderance of the evidence (and other

defective procedural protections), and an obsolete detention standard that asks only whether a

petitioner had – 15 years prior – been part of a group that was then targetable under the AUMF.

At this point, these features make the risk of erroneous detention too great and likewise compel

granting the writ.

Third, for Petitioners Al Bihani and Nasser, who have been approved for transfer through

deliberative executive-branch interagency processes, continuing detention most clearly serves no

legitimate purpose, as the government itself has determined; their detentions are thus particularly

senseless and arbitrary.

### 1.     The Duration and Circumstances of Petitioners' Detention Violate Substantive Due Process.

Due process is a concept that requires rationality and proportionality in government

action; it is designed to limit excessive or arbitrary executive action.  Accordingly, the Due

Process Clause "contains a substantive component that bars certain arbitrary, wrongful

government actions, regardless of the fairness of the procedures used to implement them."

*Foucha*, 504 U.S. at 80 (1992).  Petitioners have been detained without charge at Guantánamo in

some cases for more than 15 years – longer than the duration of any prior military conflict in

U.S. history.  The individual facts and circumstances of their cases – what they may or may not

have done, or who they may have or not associated with 15 years ago – are essentially irrelevant

to the decision to continue depriving them of liberty; their detention is driven by a new *de facto*

executive branch policy – contrary to the policies of the past two administrations – to prevent

their transfer, regardless of legal process or substantive limitations on executive detention

authority.  The proper constitutional response to such a threat is judicial intervention.[48]

Specifically, the Supreme Court has instructed that substantive due process places limits

on the duration of executive detention – undertaken for special circumstances outside criminal

process – of the kind at issue here.  *See Zadvydas v. Davis*, 533 U.S. 678, 692 (2001) ("A statute

permitting the indefinite detention of an alien would raise a serious constitutional problem."); *see*

*also Clark v. Martinez*, 543 U.S. 371, 384 (2005) (recognizing that detention only authorized for

"a period consistent with the purpose" of the original detention); *United States v. Salerno*, 481

U.S. 739, 747 (1987) (upholding pre-trial civil detention statute in part because maximum length

of detention was "limited by the stringent time limitations of the Speedy Trial Act").  Indeed, the

Court in *Hamdi* recognized that the purpose for which the Court ratified an initial "enemy

---

[48] These due process limitations in effect mirror the normative constitutional considerations set forth in the Constitution's Bill of Attainder provisions, U.S. Const. art I, §§ 9, 10, which likewise serve as an important "constitutional bulwark in favor of personal security and private rights." The Federalist No. 44, at 218 (James Madison) (Terrence Ball ed., 2003). Even though Trump's actions are not codified in traditional legislative form, his decision to single out "specially designated groups or persons" – not because of conduct but because of their unpopular status – undermines the separation of powers principles embedded in that constitutional constraint and further counsels for judicial scrutiny.  *Nixon v. Adm'r of General Servs.*, 433 U.S. 425, 447 (1977).  This is particularly so where Trump's actions are partly attributable to intemperate and mal-formed appeals to populist and xenophobic animus toward Muslims.  *See id*. at 480 (Bill of Attainder Clause animated by the "fear that the legislature, in seeking to pander to an inflamed popular constituency, will find it expedient to assume the mangle of judge – or worse still, lynch mob.").  Accordingly, Petitioners also contend that the President's non-judicial determination to indefinitely detain them is in violation of the Bill of Attainder Clause.

combatant" detention – incapacitation from battle – had to be time bound.  *Hamdi*, 542 U.S. at

521 (holding that "indefinite or perpetual detention" is impermissible); *id*. at 536 ("[A] state of

war is not a blank check for the President."); *see also Boumediene*, 553 U.S. at 797-98 (courts

may be required to define the outer boundaries of war powers if terrorism continues to pose a

threat for years to come).

The court must reconcile any detention authority with the substantive limitations on due

process and recognize such authority is limited.  *See Hussain v. Obama*, 134 S. Ct. 1621 (2014)

(statement of Justice Breyer respecting denial of certiorari) (Supreme Court has not "considered

whether, assuming detention on these bases is permissible, either the AUMF or the Constitution

limits the duration of detention").  *Cf. Ali v. Obama*, 736 F.3d 542, 553 (D.C. Cir. 2013)

(Edwards, J., concurring) ("It seems bizarre, to say the least, that [a detainee] who has never

been charged with or found guilty of a criminal act and who has never 'planned, authorized,

committed or aided [any] terrorist attacks' is now marked with a life sentence.").  Because

perpetual detention, especially if disconnected to any legitimate purpose or tailored national

security interest, is arbitrary, the guarantees of due process forbid it.

> 2.    Due Process Especially Forbids Perpetual Detention Justified by Only a
>       Preponderance of the Evidence of Past Conduct and the Other Deficient
>       Procedures Petitioners Have Been Afforded.

In habeas proceedings conducted years ago, the government justified (and, over

Petitioners' objection, the court accepted) Petitioners' ongoing detention by satisfying a mere

preponderance of the evidence standard that Petitioners were "part of or substantially supported"

Al Qaeda or the Taliban at the time of their capture.  *See, e.g.*, *Gherebi v. Obama*, 609 F. Supp.

2d 43, 71 (D.D.C. 2009).[49] Against a backdrop of an express executive branch policy to close the prison, the government proffered (and the Court accepted) such a low burden of proof, with its attendant risk of error, and a substantive detention standard requiring no more than membership or indirect support, on the theory that these were temporary wartime detentions that need not meet a higher threshold.

That construct has long since dissipated. Petitioners' detention can no longer be based upon "no higher degree of proof than applies in a negligence case." *Woodby v. INS*, 385 U.S. 276, 285 (1966). There is no precedent in the law that would tolerate such prolonged, indefinite detention based on a preponderance standard and its correspondingly heightened risk of error. In evaluating the constitutionality of prolonged detention schemes, the Supreme Court has consistently required no less than clear and convincing evidence. *See, e.g., Woodby*, 385 U.S. at 286 (1966) (deportation); *Kansas v. Hendricks*, 521 U.S. 346, 352 (1997) (civil commitment of sex offenders); *Foucha*, 504 U.S. at 81 (civil commitment of criminal defendant found not guilty by reason of insanity); *Salerno*, 481 U.S. at 747 (pre-trial detention based on dangerousness); *Nowak v. United States*, 356 U.S. 660, 663 (1958) (denaturalization)*; see also United States v. Jordan*, 256 F.3d. 922, 923 (9th Cir. 2011) (sentence enhancements that would have an "extremely disproportionate" effect on the sentence relative to the offense must be proved by clear and convincing evidence).

Indeed, the government's asserted security interests have only grown weaker since the initial apprehension and detention of Petitioners. At the same time, 16 years into their detention

---

[49] The government may detain "persons who were part of, or substantially supported, Taliban or al-Qa[e]da forces or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act, or has directly supported hostilities, in aid of such enemy forces." *Gherebi*, 609 F. Supp. 2d at 53.

for some – a sentence that resembles the upper range of sentences for felony convictions that are

based upon a finding of guilt beyond a reasonable doubt, it is Petitioners who now face an

intolerable burden.  *See Rasul*, 542 U.S. at 488 (Kennedy, J., concurring) ("[A]s the period of

detention stretches from months to years, the case for continued detention to meet military

exigencies becomes weaker.").  Due process cannot tolerate imprisonment without end on such

thinly-based proof.

Likewise, the procedural protections that had been in place when courts validated the

legality of these detentions years ago further undermine the legality of continuing – and

potentially lifetime detention.  *See, e.g., Latif v. Obama*, 666 F.3d 746, 755 (D.C. Cir. 2011)

(affording "presumption of regularity" to government's evidence); *Al-Adahi v. Obama*, 613 F.3d

1102, 1105-06 (D.C. Cir. 2010) (accepting the "conditional probability" that otherwise unreliable

evidence might be reliable if assessed in light of other, often unreliable evidence); *Al-Bihani*, 590

F.3d. at 879 ("hearsay is always admissible" in these cases); *id.* at 873, n.2 (visiting Al Qaeda

affiliated guesthouses "overwhelmingly, if not definitively" justifies detention).  As Judge Tatel

explained, the procedural rules accepted by the court years ago have "call[ed] the game in the

government's favor" and denied detainees the "'meaningful opportunity' to contest the

lawfulness of [their] detention guaranteed by *Boumediene*."  *Latif*, 666 F.3d at 770, 779 (Tatel,

J., dissenting).

In addition, due process should prevent perpetual non-criminal detention based on a

detention standard focused solely on past conduct or association, rather than one grounded in

present conditions: continuing detention must be connected to its ostensible purpose.  *See*

*Salerno*, 481 U.S. at 750-51 (detention under carefully limited circumstances, including proof by

clear and convincing evidence that a person presents an "identified and articulable threat" and

"no conditions of release can reasonably assure" public safety, satisfies due process); *Hendricks*, 521 U.S. at 358 (requiring proof of past violent conduct coupled with an additional present condition to justify indefinite commitment); *Foucha*, 504 U.S. at 77 ("Even if the initial commitment was permissible, 'it could not constitutionally continue after that basis no longer existed.'"). Yet Petitioners may well remain detained for their lifetime based on allegations – for many, still disputed – that 15 years ago their actions demonstrated membership or support for Al Qaeda or the Taliban.[50] For some detainees, potential lifetime detention follows from enormously attenuated 15-year-old associations (based on a mere preponderance and hearsay). *See, e.g., Razak Ali v. Obama*, 741 F. Supp. 2d 19, 26 (D.D.C. 2011) (petitioner's presence at guesthouse for two weeks is "enough, *alone*, to find he was more likely than not" a member of Al Qaeda and thus detainable).

The executive cannot be permitted to imprison individuals perpetually based on evidence of the kind and quality used in these cases. Due process compels robust judicial intervention and the issuance of the writ.

> 3. The Continuing Detention of Petitioners Approved for Transfer from Guantánamo Violates Substantive Due Process Because Their Detention Clearly No Longer Serves Its Only Ostensible Purpose.

---

[50] For any subsequent habeas petitions adjudicating the factual or legal basis for detention, in the event the court does not find that Petitioners' continuing detention violates due process, the court should revisit and require refinement of the legal basis and procedures for Petitioners' detentions – including whether there is clear and convincing evidence that a Petitioner is, under current circumstances, likely to "return to the battlefield," and thus that his detention continues to serve its only lawful purpose. *See Hamdi*, 542 U.S. at 517; *id*. at 522, n.1 ("the permissible bounds of the category [of individuals who may be lawfully detained] will be defined by the lower courts as subsequent cases are presented to them"). Only then, consistent with the protections against limitless non-criminal detention, could due process be satisfied. *See Boumediene*, 553 U.S. at 781 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (due process requires consideration of "the risk of an erroneous deprivation of [a liberty interest] and the probable value, if any, of additional or substitute procedural safeguards")).

Two Petitioners – Tofiq Nasser Awad Al Bihani and Abdul Latif Nasser – have been cleared for transfer from Guantánamo.  That is, all of the U.S. military, intelligence and law enforcement agencies with a stake in the detentions at Guantánamo have concluded there is no reason to continue to hold these petitioners.  Despite their clearances, they will continue to be held – likely up to three or even seven more years – for no purpose other than to fulfill President Trump's pledge to categorically prevent releases of detainees.  Their continued, indefinite detention is thus clearly unrelated to any lawful purpose.

The Supreme Court has repeatedly emphasized that due process requires that noncriminal detention must be reasonably tied to its ostensible purpose.  *See, e.g.*, *Clark v. Martinez*, 543 U.S. 371, 384 (2005) (detention only authorized for "a period consistent with the purpose of effectuating removal"); *Zadvydas*, 533 U.S. at 699 (same); *Kansas v. Hendricks*, 521 U.S. 346, 363-64 (1997) (upholding statute requiring civil confinement for sex offenders in part because it provided for immediate release once an individual no longer posed a threat to others); *Foucha v. Louisiana*, 504 U.S. 71, 86 (1992) (ordering petitioner's release from commitment to mental institution because there was no longer any evidence of mental illness); *O'Connor v. Donaldson*, 422 U.S. 563, 575 (1975) (even if civil commitment was founded upon a constitutionally adequate basis, it "[cannot] constitutionally continue after that basis no longer existed"); *Jackson v. Indiana*, 406 U.S. 715, 738 (1972) ("due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed.").

Yet Petitioners Al Bihani and Nasser remain in detention not because of anything they allegedly did, or anyone they allegedly associated with, but because of the government's failure

to implement its discretionary decision to release them, and now, President Trump's punitive reflex to bar any detainee from leaving Guantánamo.

For example, the government approved Petitioner Nasser for transfer to his home country of Morocco in July 2016.  On December 28, 2016, the Department of State and the Department of Defense received an affirmative response from Morocco to State's diplomatic note regarding the security assurances required for Nasser's transfer.  However, as the government admitted in response to Nasser's emergency motion in January 2017, days before the end of the Obama administration, requesting the court to waive the 30-day congressional notice requirement, "the Secretary of Defense did not make a final decision regarding the transfer . . . as he elected to leave that decision to his successor."[51]  The court declined to order release.  Now, almost ten months later, no review has taken place, nor has the Department of Defense instituted any procedural mechanism for such review to take place.  Bureaucratic inaction now means that Nasser is sentenced to lifetime detention under the Trump administration absent a court order. The current executive's open hostility to transferring any detainees, no less those already administratively cleared for transfer, cries out for principled and courageous judicial intervention.[52]

---

[51] *See* Resp't's Resp. to Pet'r's Emer. Mot. for Order Effecting Release at 6-7, *Nasser v. Obama,* 05-CV-0764 (CKK), (D.D.C. Aug. 18, 2017) (dkt no. 259).

[52] Another detainee, not a party to the instant motion, was similarly stranded at Guantánamo despite his clearance for repatriation to Algeria. That detainee, Sufyian Barhoumi (ISN 694), similarly filed an emergency motion in January 2017 seeking waiver of the 30-day congressional notice requirement. The government opposed, conceding that while Barhoumi's detention was "no longer necessary," he had not yet been transferred because the Secretary of Defense refused to sign certification paperwork required by Congressional transfer restrictions "at this time" due to factors including those "not related to Petitioner himself."  Barhoumi remains detained at Guantánamo, and to our knowledge there have been no efforts made by the Trump administration to accomplish his transfer home to Algeria despite the fact that there have been no concerns raised by Algeria's monitoring of the 15-odd Guantánamo detainees who have been repatriated there in the past.

Petitioner Al Bihani remains detained nearly *eight years* after the government determined that he could be transferred under appropriate conditions.  In early 2002, Al Bihani was apprehended in Iran, outside of any active combat zone, on suspicion that he was affiliated with the terrorist organization Al-Qaeda.  *See Al-Bihani v. Obama*, 2010 U.S. Dist. LEXIS 107590 *26 (D.D.C., Sept. 22, 2010).  For several weeks he was held at the CIA Detention Site COBALT, a CIA "black site," where he was subjected to torture that was not approved by the Department of Justice and not authorized by CIA Headquarters.[53]  On or about February 2003, Al Bihani was transferred to Guantánamo, where he has remained imprisoned for nearly 15 years.  *Al-Bihani*, 2010 U.S. Dist. LEXIS 107590 at *26.  In 2010, the Obama administration's Guantánamo Review Task Force designated Al Bihani, along with 29 other Yemeni detainees, for "conditional detention," meaning that these detainees could be released under appropriate conditions.[54]  Subsequently, the State Department began making diplomatic arrangements for the transfer of these detainees and over the course of years, submitted requests for information to Al Bihani's counsel in connection with identifying a third country to which to transfer Petitioner. Counsel provided robust and timely responses to all such requests.  By the end of the Obama administration, the U.S. government transferred all of the other 29 Yemeni detainees who were designated for conditional detention to third countries.  In April 2016, the Kingdom of Saudi Arabia agreed to receive and resettle Al Bihani, along with nine other detainees who had been

---

[53] *See* Senate Select Committee on Intelligence, Committee Study of the Central Intelligence Agency's Detention and Interrogation Program at 101-02 (Dec. 3, 2014).

[54] *See* Guantánamo Review Dispositions (Jan. 22, 2010), https://www.hsdl.org/?view&did=792419.

cleared for transfer; however, in the days leading up to the transfer, it became apparent that Al

Bihani would not be transferred.[55]

      To date, the government has not indicated any reason why Al Bihani was not transferred,

or why he should not be transferred consistent with the process and standards in place by the

executive branch and the treatment of every other similarly situated detainee.  Since President

Trump took office, Al Bihani's counsel has made several attempts to speak to the administration,

including the Department of State, but has not received any concrete guidance or information

with regard to Al Bihani's transfer.  In sum, there have been no indications that the Trump

administration has made any meaningful effort to transfer Al Bihani despite his cleared status.

## II.     <u>PETITIONERS' CONTINUING DETENTION VIOLATES THE AUMF.</u>

      The only positive-law authority under which the executive branch claims it can continue

to detain Petitioners is the Authorization for Use of Military Force ("AUMF"), Pub. L. 107-40,

§ 2(a), 115 Stat. 224, 224 (2001).  The AUMF authorizes:

> all necessary and appropriate force against those nations, organizations, or
> persons he determines planned, authorized, committed, or aided the terrorist
> attacks that occurred on September 11, 2001, or harbored such organizations or
> persons, in order to prevent any future acts of international terrorism against the
> United States by such nations, organizations or persons.

AUMF § 2(a).  The Supreme Court has permitted limited detention as a "necessary and

appropriate" use of force as long as it is consistent with long-standing law-of-war principles.

*Hamdi*, 542 U.S. at 520.  Yet, the AUMF no longer authorizes Petitioners' detentions for several

reasons.

---

[55] *See* Charlie Savage, *Nine Guantánamo Prisoners From Yemen Are Sent to Saudi Arabia*, N.Y.
Times (Apr. 16, 2016), http://nyti.ms/2m27R15.

First, the terms of the statute do not permit indefinite, unreviewable detention of the sort

Petitioners now endure.  Second, the laws of war do not permit perpetual detention unmoored to

the only legitimate purpose of wartime detention – to prevent return to the battlefield.  Last, any

AUMF authority, based on the laws of war, that may once have existed to justify the detention of

individuals captured 15 years ago has since "unraveled," *Hamdi*, 542 U.S. 520, and cannot

support the continued detention of Petitioners.  Indeed, the Court should construe the AUMF

narrowly to limit the duration of Petitioners' detention in order to avoid the serious constitutional

concerns that would be raised by a statute that authorizes such non-criminal detention potentially

for the remainder of their lives.  *See Ashwander v. Tennessee*, 297 U.S. 288 (1936).

A.       **The AUMF Prohibits Perpetual Detention**

While the AUMF permits the use of "necessary and appropriate force" against a narrow

set of groups or individuals connected to the September 11 attacks in order to prevent "future

acts of international terrorism against the United States," the statute "does not authorize

unlimited, unreviewable detention."  *Basardh v. Obama*, 612 F. Supp. 2d 30, 34 (D.D.C. 2009).

*Cf. Al Ginco v. Obama*, 626 F. Supp. 2d 123 (D.D.C. 2009) (Leon, J.) (granting the writ where

the purpose of AUMF detention is not served).  This is especially so as to Petitioners the

government has already approved for transfer.

Indeed, in *Hamdi*, the Supreme Court stated unequivocally that the AUMF does not

authorize indefinite or perpetual detention, and "indefinite detention for the purpose of

interrogation is not authorized."  542 U.S. at 521.  Even in circumstances where detention may

be "necessary and appropriate" to prevent a combatant's return to the battlefield, that

justification may "unravel" if the practical circumstances of the conflict are entirely unlike those

that informed the development of the laws of war – in other words, if they allow for perpetual

war and thus perpetual detention.  *Id.* at 521.  *See infra,* Section II.C.  The AUMF's delegation of "necessary and appropriate" force does not justify Petitioners' indefinite, potentially permanent, detention.

**B.      The Laws of War, Which Inform the AUMF, Do Not Authorize Detention that Is No Longer Tied to Its Ostensible Purpose**

Because the AUMF does not directly authorize detention, that authority must be found elsewhere.  As *Hamdi* held, the power to detain may be inferred from the right to use force under "longstanding law-of-war principles."  542 U.S. at 518, 521.  Under the laws of war, detention may not be punitive, and is permitted only "to prevent captured individuals from returning to the field of battle and taking up arms once again."  *Id.* at 518; *id.* at 519 (although the AUMF "does not use specific language of detention," detention "to prevent a combatant's return to the battlefield is a fundamental incident of waging war" and thus permitted).  Given that Yasser Hamdi was allegedly captured with a weapon on the battlefield in Afghanistan in 2001, the Court concluded that detention was authorized in those "narrow circumstances" – where necessary to prevent return to an active Afghan battlefield that it determined continued to exist in 2004 – but could last "no longer than active hostilities" (which did not mean perpetually, *see supra*, Section II.A).  *Hamdi*, 542 U.S. at 520 (citing Third Geneva Convention art. 118, which provides that "Prisoners of war shall be released and repatriated without delay after cessation of active hostilities").[56]

---

[56] For its part, the government has long acknowledged that its AUMF detention authority is informed and limited by these law-of-war principles.  *See* Resp'ts' Mem. Regarding the Gvt's Detention Authority Relative to Detainees Held at Guantánamo Bay at 1, *In Re Guantánamo Bay Detainee Litigation*, No. 08-mc-442 (TFH) (D.D.C. Mar. 13, 2009) (dkt. no. 1689) ("Principles derived from law-of-war rules governing international armed conflicts, therefore, must inform the interpretation of the detention authority Congress has authorized for the current armed conflict.") (citing Geneva Conventions).

Even if the court were to assume Petitioners were all captured in similar circumstances – and they were not – the limited purpose for which the laws of war may have authorized their detention at Guantánamo to prevent return to the battlefield, has long since faded more than 15 years after their capture.  The conflict against the core Al Qaeda organization in connection with which they were captured has ended and been taken over by disparate battles involving new groups.  *See infra*, Section II.C.  The battlefields in which they were captured, if any, are no more, thus dissolving the only legitimate purpose of their detention.  The baseless and arbitrary nature of these detentions is particularly clear in the case of Petitioners the government has approved for transfer and effectively conceded there is no reason to continue to detain.

In addition, even assuming Petitioners were once part of a targetable group, their past membership alone is no longer enough, if it ever was, to presume a threat of return to the battlefield.  In *Hamdi*, detention was arguably justified in 2004 when there were active hostilities in Afghanistan, upon a sole finding that Hamdi was a member of forces engaged in those hostilities, because such a factual finding reasonably supported a presumption that his membership made a return to the battlefield more likely.  But the relevant inquiry today – 14 years after *Hamdi* was decided – of whether Petitioners' detention continues to serve a lawful purpose, cannot be limited to membership in a targetable group.  Given the radically different facts on the ground, it simply no longer can follow that such membership alone presumes any likelihood of return to the battlefield.[57]

---

[57] Any perspective on the laws of war confirms this understanding.  In situations of international armed conflict, fought between nation-states and governed by the Third and Fourth Geneva Conventions, detention is not authorized where it no longer serves an "imperative security purpose" (in the case of civilians) or where a detainee is "no longer likely to take part in hostilities against the Detaining Power" (in the case of combatants).  Jean-Marie Henckaerts & Louise Doswald-Beck, 1 *Customary International Humanitarian Law*, Rule 99, at 344-45 (Int'l Comm. of the Red Cross, Cambridge Univ. Press reprtg. 2009).  This limit on detention is even

Petitioners cannot continue to be detained when the original purpose of their detention has evaporated and they remain in Guantánamo for reasons wholly apart from legitimate needs grounded in the laws of war.[58]

\*       \*       \*

In sum, Petitioners' detention is – and will remain – arbitrary and perpetual by any reasonable measure, which the Court should conclude violates the AUMF.  As Justice Souter explained in his opinion concurring in the *Hamdi* judgment, when a court is asked to infer detention authority from a wartime resolution such as the AUMF, it must assume that Congress intended to place no greater restraint on liberty than was unmistakably indicated by the language it used; the qualified "necessary and appropriate" force language of the AUMF necessarily suggests that AUMF detention authority is equally limited.  542 U.S. at 544 (quoting *Ex Parte Endo*, 323 U.S. 283, 300 (1944)).  The Court should, consistent with the canon of constitutional avoidance, *see Ashwander v. Tennessee*, 297 U.S. 288 (1936), similarly construe the AUMF narrowly in order to avoid the obvious, serious constitutional problems that a statute permitting Petitioners' indefinite, arbitrary detention would raise.  *See Zadvydas*, 533 U.S. at 689-90

---

stricter in the context of non-international armed conflicts, including the conflict with Al Qaeda, *see Hamdan v. Rumsfeld,* 548 U.S. 557, 629-30 (2006).  In non-international armed conflicts, "the need for a valid reason for the deprivation of liberty concerns both the initial reason for such deprivation and the continuation of such deprivation."  Henckaerts, *supra*, Rule 99, at 348; *id.*, Rule 128(C), at 451 ("Persons deprived of their liberty in relation to a non-international armed conflict must be released as soon as the reasons for the deprivation of their liberty cease to exist.").

[58] Although foreclosed by D.C. Circuit precedent, *see Khairkhwa v. Obama*, 703 F.3d 547, 550 (D.C. Cir. 2012), Petitioners also preserve the argument that their detention is not authorized by the AUMF because the government has never contended and/or established that they were engaged in armed conflict against the United States in Afghanistan prior to their capture.  *See Hussain v. Obama*, 134 S. Ct. 1621 (2014) (statement of Justice Breyer respecting denial of certiorari) ("The Court has not directly addressed whether the AUMF authorizes, and the Constitution permits, detention on the basis that an individual was part of al Qaeda, or part of the Taliban, but was not 'engaged in an armed conflict against the United States' in Afghanistan prior to his capture.'").

(construing statute authorizing detention of admitted aliens to contain reasonable time limitation

in order to avoid serious constitutional concerns raised by indefinite detention); *Clark v.*

*Martinez*, 543 U.S. 371, 380-81 (2005) (construing statute to limit detention of aliens not

formally admitted to the United States to avoid constitutional issues); *see also INS v. St. Cyr*, 533

U.S. 289, 299-300 (2001) (applying habeas statute and stating that "if an otherwise acceptable

construction of a statute would raise serious constitutional problems, and where an alternative

interpretation of the statute is 'fairly possible,' we are obligated to construe the statute to avoid

such problems") (citation omitted).  In doing so, the Court would be well within its jurisdiction

and fairly construing the plain language of the statute to avoid otherwise serious constitutional

concerns.  *See Skilling v. United States*, 561 U.S. 411 n.44 (2010).[59]

## C.    Any Authority to Detain Petitioners Under the AUMF and the Laws of War Has Unraveled

Alternatively, the Court should grant relief because whatever traditional law-of-war

detention authority may have existed at the time of Petitioners' capture and initial detention has

by now unraveled, 15 years after the fact.  In *Hamdi*, the Court's finding of detention authority

under the AUMF turned on the detention situation presented to it in 2004 – *e.g.*, the detention of

an individual captured on the battlefield in Afghanistan in 2001 – and traditional law of war

principles permitting detention for the duration of the same active hostilities to prevent return to

---

[59] Nor does the D.C. Circuit's substantial body of precedent holding that the AUMF authorizes the detention of individuals who are "part of" the Taliban, Al Qaeda or associated forces, and whom the government has determined it is necessary and appropriate to detain as part of ongoing armed conflict, preclude such relief.  Although D.C. Circuit case law unquestionably affords the government broad authority to hold Guantánamo detainees, no decision of that court has addressed the question presented here – whether the AUMF permits indefinite detention, likely for life absent a court order granting the writ, particularly in circumstances where there is no longer a legitimate purpose for detention.  *See also Hussain v. Obama*, 134 S. Ct. 1621 (2014) (statement of Justice Breyer respecting denial of certiorari) (Supreme Court has not "considered whether, assuming detention on these bases is permissible, either the AUMF or the Constitution limits the duration of detention").

the battlefield.  The Court acknowledged, however, the challenge of granting the executive branch authority to detain in an unconventional conflict that it recognized could last longer than any conventional armed conflict.  To anticipate this potential unacceptable result, it cautioned that "if the practical circumstances of a given conflict are entirely unlike those of the conflicts that informed the development of the law of war," detention authority under the AUMF might "unravel."  *Hamdi*, 542 U.S. at 521.

To the extent an armed conflict with the Taliban, Al Qaeda or associated forces continues today, which Petitioners do not concede, the practical circumstances of that conflict have plainly become entirely unlike those of the conflicts that have informed the development of the laws of war, and the AUMF can no longer justify Petitioners' detention.  To begin, Petitioners are now in the position of the perpetual detainee that so concerned the *Hamdi* court.  To the extent the government claims there is an ongoing fight against terrorism, that fight is now the longest military conflict in U.S. history, bar none.  *See Boumediene*, 553 U.S. at 771 (noting with concern, that by 2008, that post-September 11 conflict was already among the longest wars in American history). Already a decade ago, senior government officials characterized the conflict as a "Forever War."[60]  The duration of Petitioners' detention is thus unprecedented, and as discussed, will continue for the foreseeable future not for any legitimate purpose grounded in the laws of war, but largely for executive branch posturing and muscle-flexing.

Second, Petitioners are no longer being held in connection with any ongoing armed conflict involving an organized armed group responsible for 9/11, as the AUMF, as informed by the laws of war, requires, and as the *Hamdi* Court found in authorizing detention under the AUMF.  The core Al Qaeda organization they are accused of being part of has been decimated in

---

[60] Harold H. Koh, Legal Adviser (2009-2013), U.S. Dep't of State, *How to End the Forever War?*, Speech Before the Oxford Union, May 7, 2013.

the 15 years since Petitioners' capture.  Osama Bin Laden and Al Qaeda's core leadership are

dead, imprisoned or detained.[61]  What are left are remnants against which U.S. hostilities in

Afghanistan and elsewhere are not directed today.[62]  Instead, Petitioners are ostensibly being

held in connection with an ever-expanding "war" against terrorism involving new actors bearing

no actual connection to Al Qaeda or 9/11, which appears to have neither geographic, durational

nor organizational constraints.[63]  The laws of war, permissive as they can be, did not contemplate

---

[61] *See, e.g.*, *Text of President Obama's May 23 Speech on National Security*, Wash. Post (May 23, 2013) (Today, Osama bin Laden is dead, and so are many of his top lieutenants. . . . Today, the core of Al Qaeda in Afghanistan and Pakistan is on the path to defeat. . . .  They have not carried out a successful attack on our homeland since 9/11."), http://wapo.st/2D4TSQp; Leon E. Panetta, Sec'y of Def., *The Fight Against Al Qaeda: Today and Tomorrow*, Speech at The Center for a New American Security, Nov. 20, 2012 ("Over the last few years, al-Qaeda's leadership, their ranks have been decimated. . . . As a result of prolonged military and intelligence operations, Al-Qaeda has been significantly weakened in Afghanistan, and Pakistan.  Its most effective leaders are gone.  Its command, and control have been degraded, and its safe haven is shrinking."), http://bit.ly/2Egbp7l; *see also* Mark Mazzetti & Matthew Rosenberg, *U.S. Considers Faster Pullout in Afghanistan*, N.Y. Times (July 8, 2013), http://nyti.ms/2CO0IMm; Inaugural Address by President Barack Obama, Jan. 21, 2013 ("A decade of war is now ending.").

[62] *See* Mot. to Grant Pet'n for Writ of Habeas Corpus, *Al Warafi v. Obama*, No. 09-CV-2368 (RCL) (D.D.C. filed Feb. 26, 2015) (dkt. no. 80) (collecting statements by President Obama). Although the government contends that it retains detention authority under the AUMF because fighting continues in Afghanistan, it concedes that the U.S. combat mission has ended, and U.S. involvement has transitioned to training, advising and assisting Afghan national forces and counterterrorism operations.  *See* Resp'ts' Opp'n to Pet'r's Mot. to Grant Pet'n for Writ of Habeas Corpus, *Al Warafi v. Obama*, No. 09-CV-2368 (RCL) (D.D.C. filed Apr. 24, 2015) (dkt. no. 84-1).

[63] Steve Coll, *Name Calling*, The New Yorker (Mar. 4, 2013) ("Experts refer to these groups by their acronyms, such as AQI (Al Qaeda in Iraq), AQAP (Al Qaeda in the Arabian Peninsula, mainly in Yemen), and AQIM (Al Qaeda in the Islamic Maghreb, the North African group that has recently been attacked by French forces in Mali).  Each group has a distinctive local history and a mostly local membership.  None have strong ties to 'core Al Qaeda'"), http://bit.ly/2ABqTk9. For example, the government has invoked the AUMF to attack groups like Al Shabaab in Somalia, which did not exist until many years after the September 11 attacks and are largely regionally-focused.  *See* Charlie Savage, *Obama Expands War With Al Qaeda to Include Shabab in Somalia*, N.Y. Times (Nov. 27, 2016) ("The executive branch's stretching of the 2001 war authorization against the original Al Qaeda to cover other Islamist groups in countries far from Afghanistan — even ones, like the Shabab, that did not exist at the time — has

such sweeping detention authority.  The practical circumstances of today's conflict bear no resemblance to those that informed the development of the laws of war; as such, the *Hamdi* court's understanding that detention may be authorized for the "duration of the relevant conflict" under the laws of war and the AUMF has eroded.  The Court is obligated to look behind the constantly elastic "forever war" rhetoric of the executive branch,[64] consistent with its habeas role.  It should conclude that the AUMF does not permit such lifetime detention of a kind without historical or legal precedent.

## III.   THE COURT SHOULD EXERCISE ITS BROAD, EQUITABLE COMMON LAW HABEAS AUTHORITY TO GRANT RELIEF WITHOUT FURTHER DELAY.

As the Supreme Court has explained, habeas corpus at its base seeks to ensure than any deprivation of liberty is in accordance with law.  *See Boumediene*, 553 U.S. at 745. And, because "[t]he practice of arbitrary imprisonment[ ] [has] been, in all ages, [among] the favorite and most formidable instruments of tyranny"; *Boumediene*, 553 U.S. at 744 (quoting The Federalist No. 84, at 512 (Alexander Hamilton) (Clinton Rossiter ed., 1961)), the *Boumediene* Court repeatedly emphasized the critical role of habeas as a check on arbitrary executive power.  *See Boumediene*, 553 U.S. at 744-45, 783, 794, 797; *see also INS v. St. Cyr*, 533 U.S. 289, 301 (the writ's

_____

prompted recurring objections from some legal and foreign policy experts."), http://nyti.ms/2D1jNIo.

[64] As one commentator observed, "[A]s long as there are bands of violent Islamic radicals anywhere in the world who find it attractive to call themselves Al Qaeda, a formal state of war may exist between Al Qaeda and America.  The Hundred Years War could seem a brief skirmish in comparison."  *See* Coll, *supra* at n.63; *see also* Koh, *supra* at n.60 ("[I]f we are too loose in who we consider to be 'part of' or 'associated with' Al Qaeda going forward, then we will always have new enemies, and the Forever War will continue forever.").  The government also notably invokes the AUMF as justification for attacking not only Al Qaeda franchise groups, but also the Islamic State in Syria, even though that group did not exist until recently and is currently fighting *against* Al Qaeda, as well as justification for attacking Syrian national forces fighting both Al Qaeda and the Islamic State.  *See* Marty Lederman, *The Legal Theory Behind the President's New Military Initiative Against ISIL*, JustSecurity.org (Sept. 14, 2014) (posting statement from senior administration official).

protections have been "strongest" when "reviewing the legality of Executive action."). The constitutional guarantee of habeas reflected in the Suspension Clause was designed to "protect against cyclical abuses of power," and ensure that the judiciary can deploy the common law writ to "maintain the 'delicate balance of governance' that is itself the surest safeguard of liberty." *Boumediene*, 553 U.S. at 745 (quoting *Hamdi*, 542 U.S. at 536).

President Trump's policy to detain all current detainees in Guantánamo is not in accordance with law. It is not based on individualized considerations of any Petitioner's status or conduct. Like other policies initiated by this President, it is a reflection of executive will and discretion, driven by undifferentiated suspicion of Muslims as a group, an entitlement to animus, as well as reflexive opposition to prior executive action. The executive branch cannot, however, "switch the constitution on or off at will." *Boumediene*, 533 U.S. at 765. In such circumstances, the judiciary's obligation via the writ compels action. As explained by Professor Paul Halliday – the pre-eminent historian of habeas corpus – the point of habeas corpus at common law was to ensure that "justice should be done . . . even when the law had not previously provided the means to do so" and "the word for this vast authority to do justice, even in the absence of previously existing rules or remedy" is "equity." Paul D. Halliday, Habeas Corpus from England to Empire 87 (2010); *see id*. at 30-31 (explaining that courts used habeas corpus to hold jailers to account where detention was "repugnant to common law and common weal.")

A central function of the Suspension Clause is to protect the "rights of the detained by affirming the duty and authority of the judiciary to hold the jailer to account." *Boumediene*, 553 U.S. at 745. And, that authority – indeed obligation – to hold the executive branch accountable to law is independent of whether prior procedures afforded these detainees were adequate. *See Boumediene*, 553 U.S. at 785 ("Even when the procedures authorizing detention are structurally

sound, the Suspension Clause remains applicable and the writ relevant."); *see also* Halliday,

Habeas Corpus at 104 (explaining the writ's accountability mechanism included authority to

order release, not just for violation of substantive rights, but where detention "could not be

authorized by law or facts."); Eric M. Freedman, *Habeas Corpus in Three Dimensions,*

*Dimension III: Habeas Corpus as an Instrument of Checks and Balances*, 8 NE. U. L.J. 251, 305

(2016) ("The inherent authority to grant writs of habeas corpus in the absence of a valid

suspension is one of the attributes of the 'judicial power' that Article III grants.")

    The court has broad equitable power to authorize the relief requested by Petitioners.

"[C]ommon law habeas was, above all, an adaptable remedy.  Its precise application and scope

changed depending upon the circumstances," *Boumediene*, 553 U.S. at 779, which is why habeas

courts often did not follow black letter rules in order to afford the greater protections and

collateral review required for detentions outside of criminal process, *id.* at 780.  Indeed, habeas

authorizes courts broadly to correct miscarriages of justice, *McClesky v. Zant*, 499 US. 467, 502

(1991); *Harris v. Nelson*, 394 U.S. 286, 291 (1969), and to impose flexible, pragmatic remedies,

*Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993).  That broad authority "to formulate

appropriate orders for relief," assuredly includes "if necessary, an order directing the prisoner's

release."  *Boumediene*, 553 U.S. at 787.

    Perpetual detention of individuals outside the criminal process, approaching two decades

in some instances, and where driven by little more than executive fiat is precisely the place at

which the judiciary's equitable habeas powers should be most adaptable and responsive.

Throughout the common law of habeas, judgments

> did not just happen; they were made.  Judges, not rules, made them. . . . By
> negotiating settlements, by constraining – sometimes undermining – the statutes
> or customs on which other magistrates acted, and by chastising those who

> wrongfully detained others, the justices defined what counted as jurisdiction and
> what counted as liberties.

Halliday, Habeas Corpus at 101.  Now, as then, the court is authorized to call the executive to

account.  It should grant Petitioners' the writ.

## CONCLUSION

Executive fiat, untethered to a legitimate purpose authorized under the laws of war, does

not permit the perpetual detention of individuals who have already been confined for as many as

16 years without charge.  The Constitution and congressional enactments impose meaningful

limits on the arbitrary and assertedly unreviewable power of this President.  It is the duty of the

judicial branch to identify and enforce those limits.  Petitioners' writs of habeas corpus should be

granted.

Dated:      January 11, 2018

Respectfully submitted,

/s/ Pardiss Kebriaei
Baher Azmy (Pursuant to LCvR 83.2(g))
Pardiss Kebriaei (Pursuant to LCvR 83.2(g))
J. Wells Dixon (Pursuant to LCvR 83.2(g))
Omar A. Farah (Pursuant to LCvR 83.2(g))
Shayana D. Kadidal (D.D.C. Bar No. 454248)
Noor Zafar (Pursuant to LCvR 83.2(g))
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel:  (212) 614-6452
Fax:  (212) 614-6499
pkebriaei@ccrjustice.org
bazmy@ccrjustice.org
wdixon@ccrjustice.org
ofarah@ccrjustice.org
skadidal@ccrjustice.org
nzafar@ccrjustice.org

*Counsel for Petitioner Sharqawi Abdu Ali Al-Hajj
(ISN 1457), Case No. 09-cv-745 (RCL)*

/s/ George M. Clarke III
George M. Clarke III, DC Bar No. 480073
815 Connecticut Avenue, N.W.
Washington, DC 20006
Phone: (202) 835-6184
Fax: (202) 416-7184
Email: george.clarke@bakermckenzie.com

REPRIEVE
Clive Stafford-Smith
Shelby Sullivan-Bennis
PO Box 3627
New York, NY 10163
(929) 376-8446
clive@reprieve.org.uk
shelby@reprieve.org

*Counsel for Petitioner Tofiq Nasser Awad Al Bihani
(ISN 893), Case No. 05-cv-2386 (RBW)*

/s/ Thomas A. Durkin
Thomas Anthony Durkin (IL. Bar No. 697966)
Robin V. Waters (IL. Bar No. 6317340)
DURKIN & ROBERTS
2446 N. Clark St.
Chicago, IL 60614
(312) 913-9300
tdurkin@durkinroberts.com
rwaters@durkinroberts.com

REPRIEVE
Clive Stafford-Smith
Shelby Sullivan-Bennis
PO Box 3627
New York, NY 10163
(929) 376-8446
*clive@reprieve.org.uk*
*shelby@reprieve.org*

*Counsel for Petitioner Abdul Latif Mohammed
Nasser (ISN 244), Case No. 05-cv-764 (CKK)*

/s/ Martha Rayner
Martha Rayner
Clinical Associate Professor of Law
Fordham University School of Law

41

150 West 62nd Street, 9th Floor
New York, New York 10023
mrayner@lsls.fordham.edu
212-636-6941

*Counsel for Petitioner Sanad Ali Yislam Al-Kazimi*
*(ISN 1453), Case No. 05-cv-2386 (RBW)*

/s/ Mari Newman
Darold W. Killmer
Mari Newman
KILLMER, LANE & NEWMAN, LLP
1543 Champa Street
Suite 400
Denver, CO 80202
(303) 571-1000
Fax: (303) 571-1001
dkillmer@killmerlane.com
mnewman@killmerlane.com

*Counsel for Petitioner Suhail Abdu Anam Sharabi*
*(ISN 569), Case No. 04-cv-1194 (UNA)*

/s/ Stephen M. Truitt
Stephen M. Truitt
600 Fourteenth Street NW
Hamilton Square, Suite 500
Washington, DC 20005
(202) 220-1452
truittsm@gmail.com

Charles H. Carpenter
CARPENTER LAW FIRM plc
210 North Higgins Avenue, Ste. 336
Missoula, Montana  59802
(406)543-0511
carpentc@carpenterlawfirmplc.com

*Counsel for Petitioner Hani Saleh Rashid Abdullah*
*(ISN 841), Case No. 05-cv-23 (UNA)*

/s/ Agnieszka M. Fryszman
John R. Holland
Anna Holland Edwards
Erica T. Grossman

42

HOLLAND, HOLLAND EDWARDS &
GROSSMAN, P.C.
1437 High Street
Denver, CO 80218
Tel: (303) 860-1331
john@hheglaw.com
anna@hheglaw.com
erica@hheglaw.com

Agnieszka M. Fryszman, DC Bar No. 459208
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave., N.W.
East Tower, Suite 500
Washington, DC  20005
Tel:  (202) 408-4600
Fax:  (202) 408-4699
afryszman@cohenmilstein.com

*Counsel for Petitioner Abdul Raheem Rabbani (ISN 1460), Case No. 05-cv-1607 (RCL)*

/s/ Shelby Sullivan-Bennis
REPRIEVE
Clive Stafford-Smith
Shelby Sullivan-Bennis
PO Box 3627
New York, NY 10163
(929) 376-8446
*clive@reprieve.org.uk*
*shelby@reprieve.org*

*Counsel for Petitioner Ahmed Ghulam Rabbani (ISN 1461), Case No. 05-cv-1607 (RCL)*

/s/ H. Candace Gorman
H. Candace Gorman
Law office of H. Candace Gorman
220 S. Halsted, Suite 200
Chicago Il. 60661
312.427.2313

*Counsel for Petitioner Abdal Razak Ali (ISN 685), Case No. 10-cv-1020 (RJL)*

/s/ Darin Thompson

Darin Thompson
Assistant Federal Public Defender
Office of the Federal Public Defender
Skylight Office Tower, Ste 750
1660 W. 2nd St., NW
Cleveland, Ohio 44113
(216) 522-4856
Fax (216) 522-4321

REPRIEVE
Clive Stafford-Smith
Shelby Sullivan-Bennis
PO Box 3627
New York, NY 10163
(929) 376-8446
*clive@reprieve.org.uk*
*shelby@reprieve.org*

*Counsel for Petitioner Mohammed Abdulmalik (ISN
10025), Case No. 08-cv-1440 (CKK)*

- and -

/s/ Joseph Margulies
Joseph Margulies
Professor of Law and Government
Cornell University
238 Myron Taylor Hall
Ithaca, NY 14850

George Brent Mickum IV [Bar No. 396142]
Erin Herro
5800 Wiltshire Drive
Bethesda, Maryland 20816

Mark Denbeaux
Charles Church
Denbeaux & Denbeaux
366 Kinderkamack Rd.
Westwood, NJ 07675

Amanda L. Jacobsen
University of Copenhagen, Faculty of Law,
Studiestraede 6
Copenhagen, Denmark 1455 K

*Counsel for Petitioner Zayn Al Abidin Muhammad Husayn (ISN 10016), Case No. 08-cv-1360 (EGS)*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on January 11, 2018, I caused the Motion for Order Granting Writ of Habeas Corpus to be filed with the Court and served on counsel for Respondents via the Court's CM/ECF system.


/s/ Pardiss Kebriaei